ESTHER LAFARGUE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent La Fargue v. Commissioner
Docket Nos. 6084-78, 6085-78, 6160-78, 6897-78, 7329-78, 7330-78, 7333-78, 7844-78, 2080-79, 2081-79, 2293-79, 8185-79, 9014-79, 9259-79, 9260-79, 9262-79, 9263-79, 9444-79, 13128-79, 13129-79, 11654-80, 13051-80, 13052-80, 14471-80, 14473-80, 16193-80, 16196-80, 13284-81, 17706-81, 19111-81, 23571-81, 35889-83.
United States Tax Court
T.C. Memo 1985-630; 1985 Tax Ct. Memo LEXIS 1; 51 T.C.M. (CCH) 190; T.C.M. (RIA) 85630; December 31, 1985. Albert E. Cordova, for the petitioners. M. Catherine McKenna, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax under sections 6651(a) [2] and 6653(a) for the years and in the amounts as follows: Deficiency
in
Additions to Tax Under
Year
Income Tax
Sec.6651(a)
Sec.6653(a)
Esther LaFargue
1974
$7,016.00
$351.00
1975
7,061.00
1976
2,978.00
LaFargue Trust, Trustees:
1974
2,952.03
147.60
Harry Margolis, Maxine
1975
7,907.00
Gardner & Daniel Hawkes
Emily A. LaFargue
1974
2,092.00
105.00
1975
5,935.00
1976
915.00
1977
5,494.00
Robert L. Dunnett &
1974
2,157.93
108.00
Pamela J. Dunnett
Charles Johnson
1974
3,689.00
184.00
Verne M. Walton &
1974
8,018.00
401.00
Patricia A. Walton
1975
18,287.00
1976
12,181.00
1977
49,652.00
William Berman &
1974
198,196.00
9,910.00
Nana Berman
1975
10,104.00
1976
10,054.00
1977
7,163.00
Kenneth H. Reiserer
1974
1,683.00
84.00
& Deanna E. Reiserer
1975
985.00
Eugene H. Langsam &
1975
16,928.00
Myra C. Langsam
Walter Albert &
1975
17,409.00
Waltraut Albert
Walter M. Kearns &
1974
9,254.00
463.00
Abigail Kearns
1975
18,907.00
1976
18,293.00
Misat Development
10/31/75
36,940.13
Corp.
10/31/76
63,803.00
$6,380.00
10/31/77
3,927.00
982.00
Jack Froom M.D.
01/31/76
62,519.74
Medical Corp.,
01/31/77
89,961.00
a California Corp.
01/31/78
151,180.00
Seymour J. DeMatoff &
1977
61,362.38
Eleanor S. Dematoff
1979
35,688.64
*2 The issues for decision are: (1) Whether each petitioner is entitled to claimed deductions for partnership losses from membership in Nevada Enterprises Partnership (NEP) for one or more of the taxable years 1974, 1975, 1976, 1977 and 1978. The determination of this issue depends upon whether NEP is entitled to deductions for (a) interest expense of $350,000, $168,402, $129,880 and $150,000 for the years 1974, 1975, 1976, and 1977, respectively; (b) a management fee expense of $111,542 for the year 1975; (c) amortization of a lease in the amount of $34,483 for each of the years 1975, 1976 and 1977; (d) depreciation of buildings for each of the years 1975, 1976 and 1977 in the amount of $8,621; (e) depreciation of cattle for the years 1976 and 1977 in the respective amounts of $43,815 and $38,293; and (f) a bank charge of $102.84 for the year 1974. (2) Whether each petitioner is entitled to an investment tax credit in one or both of the years 1974 and 1976 in connection with claimed investments by NEP of $250,000 and 76,217 *3 in property which qualified under section 38 in those respective years. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. All the individual petitioners in this case resided in California at the time of the filing of their petitions, except Charles Johnson who resided in Silver Spring, Maryland at the time his petition was filed; Eugene H. Langsam and Myra C. Langsam who resided in Lawrence, New York at the time their petition was filed; and Walter Albert and Waltraut Albert who resided in Rye, New York at the time their petition was filed. Harry Margolis, Maxine Gardner and Daniel Hawkes, trustees of the LaFargue Trust, resided in California at the time of the filing of its petitions in this case. Misat Development Corp., pursuant to the stipulation of the parties, will have venue for an appeal from the decision of this Court to the Ninth Circuit Court of Appeals, and Jack Froom M.D. Medical Corp. had its mailing address at the time of the filing of its petition in this case in Saratoga, California. Each of petitioners Esther LaFargue, Emily A. LaFargue and Charles Johnson filed individual income tax returns for each of the years involved *4 in their respective cases. Petitioner LaFargue Trust filed a Fiduciary income tax return for each of its years involved in this case and petitioner Misat Development Corp. filed corporate income tax returns for fiscal years ending October 31 for each of its years involved in this case. Petitioner Jack Froom M.D. Medical Corp. filed Federal income tax returns for fiscal years ending January 31 for each of its years involved in this case. Premier Cup Co., Inc., a small business corporation, filed a small business corporation tax return for each of its fiscal years ending June 30 involved in this case. [3] The remaining petitioners were respectively husbands and wives who filed joint Federal income tax returns for their respective years involved in this case. Mr. Harry Margolis, an attorney who specializes in the area of international tax, arranged to form a partnership to be known as Nevada Enterprises Partnership (NEP). He personally spoke to everyone in the partnership group, all of whom were either clients of his or persons associated with him in the *5 practice of law. A document entitled "Agreement of Partnership of Nevada Enterprises Partnership" recites that it is entered into the 16th day of December 1974 by and between William Berman; Leo Branton; Seymour J. DeMatoff; Robert Dunnett; Jack Froom M.D. Medical Corp., a California corporation; Charles Johnson; Walter Kearns; the LaFargue Trust; Misat Development Corp., a New York corporation; Premier Cup Co., Inc., a New York corporation; Ken Reiserer; and Verne Walton. This document was signed by or on behalf of each of the above-named parties, except Verne Walton. This document recited in part as follows: 2.PURPOSE. The partners named herein have associated themselves for the purposes of acquiring, owning, holding for investment purposes, improving, leasing, selling, exchanging, transferring, or otherwise disposing of business, residential, agricultural and other income producing properties and to engage in any and all general business activities related thereto. * * * 4. TERM. The partnership shall commence on December 16, 1974, and shall continue until dissolved by written consent of all of the partners herein named, or their successors and assigns, or as hereinafter *6 set forth. 5. CAPITAL CONTRIBUTIONS. Each partner named below shall contribute, on or before December 31, 1974, the sum following his/her/its name, for a total initial capitalization of Three Hundred Fifty Thousand Dollars ($350,000.00). Additional contributions to capital which may be required to fund the partnership business shall be agreed upon by written consent signed by all of the partners. No partner may voluntarily contribute capital to the partnership without the written consent of all of the partners. Amounts contributed to capital are not subject to interest earnings, nor may any capital contribution, or portion thereof, be withdrawn without prior written consent of all of the partners. The initial contributions are as follows: NAME
CONTRIBUTION
William Berman
$10,000
Leo Branton
10,000
Seymour DeMatoff
30,000
Robert Dunnett
10,000
Jack Froom, M.D.,
100,000
Medical Corporation
Charles Johnson
10,000
Walter Kearns
20,000
LaFargue Trust
20,000
Misat Development Corp.
35,000
Premier Cup Company, Inc.
75,000
Kenneth Reiserer
10,000
Verne Walton
20,000
6. CAPITAL ACCOUNTS. Individual capital accounts shall be maintained *7 for each partner consisting of his contribution to the initial capital of the partnership as increased by (i) any additional contributions to partnership capital made by him pursuant to this agreement; (ii) any amounts transferred to his capital account pursuant to this agreement. Such capital account shall be decreased by (iii) any distributions made to him in reduction of partnership capital; and (iv) his share of any partnership losses charged to the capital accounts of the partners pursuant to this Agreement. 7. DISTRIBUTION OF PARTNERSHIP PROFITS AND LOSSES. Generally accepted methods of accounting shall be used to determine net profits or losses accruing to or incurred by the partnership. Such net profits or losses shall be distributed or charged to the partners in the following proportions: NAME
PERCENTAGES
William Berman
2.8571%
Leo Branton
2.8571%
Seymour DeMatoff
8.5714%
Robert Dunnett
2.8571%
Jack Froom, M.D.,
28.5715%
Medical Corporation
Charles Johnson
2.8571%
Walter Kearns
5.7143%
LaFargue Trust
5.7143%
Misat Development Corp.
10.0000%
Premier Cup Company, Inc.
21.4287%
Kenneth Reiserer
2.8571%
Verne Walton
5.7143%
*8 The document further contains provisions with respect to books, records and accounting of the partnership, and its bank accounts, operations of its business, assignability of partnership interests, termination of the partnership and withdrawal of partners. A document entitled "Agreement of Sale and Assignment of Lease," recites that it is an agreement made and entered into on the 19th day of December 1974 by and between Convalescent Rehabilitation Center Services, Inc. (CRC), a California corporation, seller, and Nevada Enterprises Partnership, a California general partnership, buyer. This document further recites that the seller is the owner of the reversionary right in a working cattle ranch located in Nye and Lander Counties, Nevada, operated under the name of Monitor Ranch and that the property to be transferred consists of the Monitor Ranch land, cattle, buildings and improvements, equipment and fixtures, with a known reservation of subsurface and geothermal mineral rights in a third party. The agreement further recites that the property is subject to a leasehold agreement to Monitor Ranch Partnership (MRP) under which seller is the current lessor. The agreement further *9 recites that-- WHEREAS, the property described hereinabove is suitable for use as a tax shelter in the United States of America; and WHEREAS, seller wishes to dispose of the real property described hereinabove, and all of its rights, title and interest in and to the lease agreement referred to hereinabove; and WHEREAS, buyer wishes to acquire the real property and all rights of the seller in and to the lease agreement. NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: 1. Seller hereby sells to buyer and buyer hereby purchases from seller all of the real and personal property set forth and described hereinabove on the terms and conditions set forth below. 2. The total purchase price for the assets transferred hereunder is two million dollars ($2,000,000.00), and said purchase price consists of the aggregate of the following items. A. Land without improvement, three hundred thousand dollars ($300,000.00); B. Buildings and improvements, equipment and fixtures, two hundred and fifty thousand dollars ($250,000.00); C. Cattle, valued at four hundred fifty thousand dollars ($450,000.00); D. Lease agreement, one million *10 dollars ($1,000,000.00). The Monitor Ranch complex was composed of land which had been known as the "Monitor Ranch," the "Triple T Ranch" and the "Blue Springs Ranch." The original Monitor Ranch consisted of approximately 3,400 acres of deeded ground and 750,000 acres leased under permits from the United States Forest Service and the Bureau of Land Management. The Monitor Ranch was approximately 50 square miles and consisted of an entire valley and two mountain ranges. Its facilities consisted of a number of windmills, four or five sets of working corrals, three homes, a bunkhouse, underground storage, horse barns, scales, a cattle barn, shop area, generator room, garage, air strip, and hundreds of miles of fence. There were approximately 480 cows on Monitor Ranch at the time in 1970 when C. C. Utter and Walter Courtney looked into its acquisition. The Triple T Ranch, which was acquired to be part of the Monitor Ranch complex subsequent to 1970 but prior to 1974, was primarily a hay ranch located in the Smokey Valley. It consisted of 1,337 acres of deeded land. In addition, some Forest Service and Bureau of Land Management grazing rights came with the Triple T Ranch. The *11 Triple T Ranch had two homes, a shop, barns, generator room, and two sets of working corrals. The Blue Springs Ranch, which was also acquired to be operated as part of the Monitor Ranch complex subsequent to 1970 but prior to 1974, consisted of approximately 300 or 400 acres of deeded land which was primarily fenced feeding grounds and certain federal grazing rights. The Blue Springs Ranch had a working corral and a barn. The ranch, which was individually known as the Monitor Ranch, had been transferred by deed dated January 5, 1961, from Waldo Bozarth and Nancy Bozarth to Monitor Livestock Company (MLC), a Nevada corporation. This deed was recorded with the Lander CountyNevada Recorder on May 25, 1961, and with the Nye CountyNevada Recorder on June 7, 1961. In 1970 and during the years involved in these cases, Walter Courtney was the son-in-law of Mr. Harry Margolis. His wife, Carole Courtney, is the daughter of Mr. Margolis. Mr. Courtney was a rancher and realtor. He has been in the field of ranching all his life. In 1968 and 1969 he had a breeding herd of cattle of his own, but because of the cost of his operation in California, he went to Idaho and Nevada to look *12 for a less expensive operation. In 1970, Mr. Courtney was shown the Monitor Ranch in Nevada by a realtor, C. C. "Chug" Utter. Later Mr. Utter came to the Courtney's home in California to discuss with Mr. Courtney the formation of a partnership between the two of them to purchase the Monitor Ranch. Mr. Margolis had previously told Mr. Courtney that he would help him and his wife with financing of the purchase of a ranch when they found a ranch they considered a satisfactory operation. Mr. Courtney told Mr. Margolis about the Monitor Ranch and Mr. Margolis discussed with Mr. Courtney and Mr. Utter the financing of the purchase of the Monitor Ranch. Since the Monitor Ranch was a corporate asset of MLC, in May 1971 the stock of MLC was purchased. Robert L. Dunnett, a lawyer in the office of Mr. Margolis, negotiated the purchase of the stock of MLC from its shareholders in New Jersey. Carl Menger was the majority shareholder of MLC, but there were other shareholders. Edward M. Moran was appointed as the agent for all of the MLC shareholders. Under date of May 28, 1971, an agreement was entered into between Bonaire Development Co. (Bonaire), a California corporation, and Mr. Moran, *13 the agent for all the shareholders of MLC, for the sale of all the MLC shares to Bonaire. Bonaire was a corporation formed in 1957 or 1958. Mr. Margolis first became aware of Bonaire in the early 1960s. At that time the corporation had a different name and had several hundred shareholders. It owned shopping centers and other properties throughout the West. In the mid-'60s the corporation experienced financial difficulties and was reconstituted as Bonaire. Beginning in 1970 or 1971, the operations of Bonaire were from Mr. Margolis' law offices, first in Saratoga, California, and later in Los Gatos, California. The corporation was operated by Mr. Margolis' office from that time until it ceased business sometime after 1974. During the time Mr. Margolis' office was responsible for the operations of Bonaire, its stock was owned by Aruba Bonaire Curacao Trust Co., Ltd. (ABC), a Bahamian trust company established in 1963 and wholly owned by a Netherlands Antilles corporation. ABC was the trustee of a trust of which Mr. Margolis was the grantor (Margolis Trust) and a number of other trusts established by Mr. Margolis for various of his clients. In planning the acquisition of the stock *14 of MLC, it was contemplated that Mr. Utter would contribute to the purchase price and have an ownership interest in the ranch. The stated purchase price of the 55,500 shares of MLC stock in the purchase agreement dated May 28, 1971, was $725,000. Mr. Utter had an interest in Escrow No. 5508 which was administered by the Security National Bank of Nevada (Escrow No. 5508) for the benefit of the former shareholders of Columbia River Land and Cattle Co. (Columbia River). The instructions for Escrow No. 5508, dated October 30, 1969, provided that Columbia River was distributing all assets in liquidation to Security National Babk for collection and distribution pro rata to its shareholders. Among the assets was a promissory note dated December 27, 1968, for $551,374 from Columbia River Associates. Escrow No. 5508 showed Mr. Utter as holding 47-1/2 percent of the shares of Columbia River. The obligation to Mr. Utter under the escrow was subject to a set-off of $34,331.37. The $551,374 note, which was secured by a mortgage, was payable in equal installments of $137,843, commencing on December 31, 1973. The interest rate on the note was 10 percent. This promissory note was among the *15 assets distributed in liquidation by Columbia River to Escrow No. 5508. Mr. Margolis was looking for a method that would allow Mr. Utter to use his receivable from Escrow No. 5508 to pay $200,000 toward the cost of the MLC stock as advantageously as possible with respect to his own income taxes. In connection with accomplishing this purpose, the Martin Trust was established by Mr. Margolis' office for the Utter family. The Martin Trust Agreement was prepared by Mr. Dunnett, who was the attorney in Mr. Margolis' office representing both the Martin Trust and Mr. Utter in May 1971.The Martin Trust Agreement dated May 24, 1971, provides that Jewell Martin, as trustor, entered into a trust agreement with John Arden, Fairy Utter and Martin Besso as trustees. The initial corpus of the Martin Trust was $10, and the beneficiaries of the trust were Mr. Utter and his wife, Jane Utter, and various members of their family. Jewell Martin was Mr. Utter's father-in-law. Fairy Utter is the sister-in-law of Mr. Utter. John Arden and Martin Besso were associates of Mr. Utter. On May 24, 1971, Mr. Utter assigned to the trustees of the Martin Trust all his right, title and interest in Escrow No. *16 5508, excepting the set-off in the amount of $34,331.37. This was the only item, other than the $10 initial trust corpus, that was ever transferred into the corpus of the Martin Trust. A document entitled "Annuity Agreement," dated May 24, 1971, provided that Mr. Utter's interest in Escrow No. 5508 was transferred into the Martin Trust corpus in exchange for annuities for Jane Utter and C. C. Utter pursuant to an annuity agreement between Jane Utter and C. C. Utter and the trustees of the Martin Trust. This annuity agreement recited that the assets of Escrow No. 5508 had a net value of $660,766.37 and that Mr. Utter's participation in Escrow No. 5508 had an approximate value of $313,820. A document entitled "Agreement" recited that it was entered into the 27th day of May 1971 by and between Bonaire and John Arden, Fairy Utter and Martin Besso, as trustees of a trust established by Jewell Martin on May 24, 1971. This "Agreement" further recited that the trustees had obtained all the right, title and interest of C. C. Utter in and to Escrow No. 5508, and that Bonaire desired to utilize that escrow in connection with its anticipated purchase of MLC stock. The agreement then recited *17 that the trustees transfered and assigned their rights in Escrow No. 5508 to Bonaire, and in consideration of this transfer, Bonaire promised to pay to the trustees a sum equal to the escrow participation assigned in three annual installments commencing on December 31, 1973, with 10 percent interest on the unpaid balance. The "Agreement" further recited that in lieu of these payments, and at the option of the trustees, Bonaire granted to the trustees an option to purchase the entire outstanding capital stock of MLC, which option might be exercised in lieu of acceptance of the payments on Escrow No. 5508 as set forth in the "Agreement." The "Agreement" provided that the option might be exercised by a payment of $1,730,000 in four equal installments of $432,500, commencing January 1, 1974, but that the installments in each case should be reduced by the proceeds received by Bonaire under Escrow No. 5508. By a document entitled "Partial Assignment of Participating Right [in] Escrow Number 5508," dated May 24, 1971, Bonaire assigned to Edward M. Moran, as agent for the MLC shareholders, its right, title and interest in and to the first $200,000 to be distributed to Mr. Utter under *18 Escrow No. 5508. The agreement of May 28, 1971, between Bonaire and Mr. Moran, as agent for the shareholders of MLC with respect to the purchase of the MLC stock, provided that the $725,000 purchase price was to be paid by $35,000 cach on closing, $81,232 to be paid in four semi-annual installments, $200,000 to be paid through the assignment of Bonaire's interest in Escrow No. 5508, $258,768 to be paid through MLC's continued liability under an obligation to the Federal Land Bank in the amount of $110,686, and under an obligation to the Bozarth Estate in the amount of $148,082, and $150,000 to be paid by the cancellation of any current obligation on the part of any MLC shareholders with respect to MLC's obligation under any notes which it had executed in favor of Producer Livestock Loan Co. The agreement further set forth the number of animals that MLC guaranteed to be located on the ranch, the amount of acreage on the ranch, and the composition of that acreage. It provided for adjustments for shortages in either land acreage or cattle. A document entitled "Agreement to Purchase Stock," dated June 8, 1971, provided for the transfer of the MLC stock from Bonaire to International *19 Aesthetics Ltd. (IAL), a Nevada corporation. The stated purchase price of the stock was $1,500,000, to be paid by an unsecured promissory note from IAL. The stock of IAL was owned by a foreign corporation. After the agreement dated June 8, 1971, between IAL and Bonaire was executed, Mr. Margolis became aware that because IAL was owned by a foreign corporation the United States statutes prohibited it from having Forest Service and Bureau of Land Management grazing rights. These grazing rights were essential to any profitable operation of the Monitor Ranch. After discovering the problem with IAL holding the MLC stock, a document entitled "Agreement for Sale of Stock" was entered into between IAL and the Martin Trust. The agreement recites that it is entered into on March 20, 1972. The agreement recites that IAL is the sole owner of the Nevada corporation known as Monitor Livestock Co. and that the trustees of the Martin Trust desired to acquire that corporation. It then states: NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: (1) In 1971, Monitor was purchased by a California corporation, Bonaire Development Company, hereinafter *20 referred to as "Bonaire". The agreement of purchase dated May 28, 1971 is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. A subsequent letter agreement dated June 1, 1971 is marked Exhibit "B", attached hereto and incorporated by this reference as if fully set forth herein.TRUSTEES acknowledge that they have examined Exhibits "A" and "B" and are fully cognizant of the terms and conditions thereof. TRUSTEES are informed and recognize that C.C. Utter, one of the beneficiaries of the MARTIN TRUST, was one of the real estate brokers involved in the sale of Monitor to Bonaire. TRUSTEES have obtained full disclosure of all of the details, circumstances and background of said transaction and are fully cognizant of all items as are more particularly set forth below. (2) Bonaire disposed of the stock of Monitor to IAL in May of 1971. There is marked Exhibit "C", attached hereto and incorporated by this reference as if fully set forth herein, a copy of the Bonaire/IAL agreement of purchase. TRUSTEES have examined Exhibit "C" and acknowledge that they are familiar with the terms and conditions thereof. Pursuant to said agreement, (Exhibit *21 "C"), Bonaire is obligated to increase by a multiple of Two (2) the breeding herd on the Monitor Ranch as said herd was represented in the original Agreement of Sale (Exhibits "A" and "B"). The commitment requires a delivery by Bonaire to the Monitor Ranch of Six Hundred and Seventy-Six (676) cows, Fifty-Two (52) bulls, Ninety-One (91) heifers and Six Hundred Fifty-Three (653) calves. Of said total to be delivered, there has been provided by Bonaire as of this date, Three Hundred and Nineteen (319) cows and Twelve (12) bulls. The remainder of animals due are to be delivered under the terms of the existing agreement between IAL and Bonaire. Having examined said agreement (Exhibit "C"), TRUSTEES are satisfied with the terms and conditions thereof and hereby accept the assignment of said agreement by IAL. TRUSTEES will look solely to Bonaire for the performance of the animal delivery in the future. There is marked Exhibit "D", attached hereto and incorporated by this reference as if fully set forth herein, a form of assignment which shall be executed by IAL in favor of TRUSTEES. (3) TRUSTEES have been advised by IAL that there remain outstanding obligations secured by deeds of *22 trust to Bozarth and the Federal Land Bank as well as obligations due to the former Monitor shareholders from whom Bonaire purchased Monitor. None of these obligations are chargeable to TRUSTEES and IAL guarantees that said obligations will be paid by Bonaire and IAL will hold TRUSTEES harmless from any such obligations. In addition, IAL has advised TRUSTEES that there are certain controversies being resolved between Bonaire and the former Monitor shareholders and TRUSTEES. IAL guarantees that TRUSTEES shall suffer no pecuniary loss by virtue of any such controversies; and, further, IAL hereby warrants and guarantees to TRUSTEES that they will be fully protected and shall suffer no harm as a consequence of any such controversies. (4) The total purchase price of the Monitor stock will be One Million Five Hundred Thousand Dollars (§ 1,500,000.00). A promissory note for such sum shall be delivered to IAL by TRUSTEES contemporaneously with the execution of this agreement. Said promissory note shall bear interest at the rate of Four Percent (4%) per annum with interest payable annually and the principal amount payable on or before March 20, 1982. TRUSTEES shall be credited at the *23 rate of Eight Percent (8%) of the outstanding dollar amount presently calculated, equal to the value of the animals due to be delivered, but not yet delivered, by Bonaire. Said credit shall be given on the date that the first interest payment is due on said note. (5) IAL unconditionally guarantees that Bonaire will provide the additional animals required as more specifically stated above and in conformity with the agreement between Bonaire and IAL. ((Exhibit "C"). (6) IAL has informed TRUSTEES that there is an internal accounting cash balance due to Monitor from the former shareholders of Monitor in the amount of Eleven Thousand Two Hundred Dollars ($11,200.00).Upon payment, said sum will be the property of Monitor. IAL guarantees the collection of said sum and any action that may be required to collect said sum shall be the sole and total obligation of IAL, including if necessary, reasonable attorney's fees. (7) The parties recognize and acknowledge that the grazing permits on National Forest land have been cancelled and there is a possibility that they may not be reissued. IAL has unconditionally guaranteed TRUSTEES that the acquisition of the Monitor Ranch by United States *24 citizens will result in the reissuance and continuance of such grazing permits. IAL further guarantees to TRUSTEES that all of the grazing rights granted by both Forest Service and Bureau of Land Management, will continue to be available to Monitor for a minimum period of three years from this date. Should the grazing rights not be reissued for a period of three years or should they be materially altered, TRUSTEES have the right to rescind this agreement and to recover all sums advanced by them hereunder with interest at the rate of Ten Percent (10%). * * * This document was signed by John Arden, Fairy Utter, and Martin Besso, each as a trustee, and by Shirley R. Hughes as vice president of IAL. Under date of July 1, 1972, an "Agreement" was entered into between John Arden, Fairy Utter and Martin Besso as trustees of the Martin Trust and ABC. The "Agreement" was signed by each of the trustees and by M. D. Jobin, vice president on behalf of ABC. This agreement provides in pertinent part: WHEREAS, ABC is obligated to complete a certain payment and deliver certain animals to the Monitor Livestock Company, hereinafter referred to as "Monitor", and, WHEREAS, the parties *25 desire to adjust some of their respective obligations. NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: (1) As of this date, there remains outstanding and due to be paid by ABC an obligation secured by a deed of trust known as the Bozarth deed of trust.Said deed of trust is due and payable in annual payments of Twenty-Three Thousand Five Hundred and Twenty-Seven Dollars and Eighty-Three Cents ($23,527.83). Said payment is due on the First day of January of each year with interest on the unpaid balance at the rate of Six Percent (6%) until the total amount is paid in full. Said balance is herewith assumed by TRUSTEES, and ABC shall allow a credit against the amounts due under the NOTE hereunder in the sum of One Hundred Twenty-One Thousand Five Hundred Fifty-Nine Dollars and Seventy-Eight Cents ($121,559.78), and hereby warrants that no greater sum is due on the Bozarth note. (2) There is a further deed of trust due to the Federal Land Bank of Berkeley in the sum of One Hundred Ten Thousand Six Hundred and Eighty-Six Dollars ($110,686.00), payable annually at the rate of Eleven Thousand Dollars ($11,000.00) until the total sum *26 has been paid. Interest on the unpaid balance runs at the rate of Five and One-Half Percent (5-1/2%). TRUSTEES hereby assume said obligation and shall receive credit against the amounts due under the NOTE in the sum of One Hundred Ten Thousand Six Hundred and Eighty-Six Dollars ($110,686.00). (3) Bonaire has advised ABC and ABC acknowledges that there was an original shortage of animals to be delivered to Bonaire by the shareholders of Monitor. The parties tentatively agree that the dollar value on such shortage is Sixty-One Thousand One Hundred and Eighty-One Dollars ($61,181.00). ABC assumes full responsibility to supply these missing animals to Monitor. (4) ABC has assumed an outstanding obligation from Bonaire to the selling shareholders of Monitor a sum of Sixty-One Thousand Two Hundred and Thirty-Two Dollars ($61,232.00) which is payable in installments of Twenty Thousand Dollars ($20,000.00) each on March 1, 1972 and September 1, 1972 and an installment of Twenty-One Thousand Two Hundred Thirty-Two Dollars ($21,232.00) on March 1, 1973. The obligation is presently in default since the payment due on March 1, 1972, has not been paid and the holders of the promissory *27 note respresenting said obligation have elected to accelerate the payment and commence the running of interest at the rate of Six Percent (6%) per year. TRUSTEES now assume said obligation, with the express understanding that the representations of the Monitor shareholders concerning the amount of animals present on the Monitor Ranch shall be the subject of binding arbitration between Bonaire and the Monitor shareholders. ABC guarantees that the arbitration will result in the obligation represented by said note being reduced at least Sixty-One Thousand One Hundred and Eighty-One Dollars ($61,181.00). Any recovery in excess of that figure shall be the property of Monitor or TRUSTEES at TRUSTEES' option. (5) ABC has assumed an obligation of Bonaire to deliver to Monitor animals at the value of Four Hundred Six Thousand Eight Hundred Eighty-Eight Dollars and Ninety-Six Cents ($406,888.96). (6) ABC consents to the assumption of the Bozarth and Federal Land Bank obligations by Monitor Livestock Company, and immediately upon said assumption, TRUSTEES shall have no further responsibility for such sums. (7) ABC acknowledges that the interest rate due from TRUSTEES on the NOTE is only *28 Four Percent (4%) and that the varying obligations assumed by TRUSTEES carry greater interest rates. ABC will, therefore, effective January 1, 1973, make available to trustee the total sum of Two Hundred Fifty Thousand Dollars ($250,000.00) without interest for a period of Thirty-Six (36) months any oral of which may be claimed by TRUSTEES at any time on Thirty (30) days written notice to ABC. The total use of money provided for shall be employed by TRUSTEES solely and exclusively in Monitor and for no other purpose. The total use of the money must be made within a period of Seventy-Two (72) months or the right to the use of the money shall expire. (8) ABC agrees to return to TRUSTEES the interest of C. C. Utter in and to escrow No. 5508 administered for the benefit of the former stockholders of the Columbia River Land and Cattle Co. of Claskania, Oregon, administered by the Security National Bank of Reno, Nevada, as held by TRUSTEES and delivered to Bonaire. ABC will collect the Utter participation from such escrow for the account of TRUSTEES and will deliver each such payment to TRUSTEES without charge of any kind. The agreement entered into between Bonaire and TRUSTEES of *29 May 27, 1971, with reference to such interest is hereby cancelled in all respects. A document entitled "Escrow Instructions" to the First American Title Co. of Nevada executed on behalf of Millett Ranch, Inc., and signed by Walter Courtney, dated January 6, 1972, provided in part as follows: We hand you herewith the following items: I. Grant, Bargain and Sale Deed in favor of C.C. UTTER and WALT COURTNEY, describing: * * * [the Blue Springs Ranch] Which you are authorized to record and/or deliver when you hold for our account the following: 1. Cash in the sum of $1,941.60. 2.The sum of $1,200.00 to be applied to the interest due on Item [illegible] below and paid through escrow. 3. A Promissory Note executed by C.C. UTTER and WALT COURTNEY in favor of MILLETT RANCH, INC. in the principal sum of $60,000.00 payable in interest only semi-annually at the rate of 4 per cent per annum. First semi-annual interest payment to be paid concurrently with recording the Deed described in Item No. I above. Second semi-annual interest payment to be paid on or before six months from the recording of the Deed. Principal payable $6,000.00 or more semi-annually plus interest. *30 First principal payment to commence five years from date of recording Deed and continuing until paid in full. 4. Promissory Note executed by C.C. UTTER and WALT COURTNEY in favor of MILLET RANCH, INC. in the amount of $17,474.40 payable sem-annually in installments of $1,747.44 plus interest at the rate of 7 per cent per annum. Interest to commence on the date of recording of the Deed. First semi-annual principal and interest payment shall be due six months from the date of recording of the Deed. 5. Deed of Trust given as security for Items No. 3 and 4 above encumbering property described in the Deed referred to in Item No. I above. The Promissory Note in Item No. 4 is given for the purchase of Forest Service Grazing Permits referred to as Birch Creek, Northumberlands, Hot Springs and Hot Springs (temporary) and the BLM permit commonly known as WIX allotment and Kingston allotment. The total sum being paid for these range rights is predicated on $12.00 per active Class 1 AUM estimated to be 1618 AUMs. In the event that any Class 1 AUM is deducted from the permit by the Forest Service or BLM within eighteen months from date of recording the Deed, the beneficiary under the *31 Note in Item No. 4 will credit the unpaid balance of the Note by the [illegible] of AUM units deducted at the rate of $12.00 per AUM. As memorandum only which you as Escrow Agent shall not be concerned with: At the end of five years from date of recording the deed or at such time as the Note in Item No. 4 above has been paid in full then the Buyer herein, C.C. UTTER and WALT COURTNEY agree to deed the property described in Item No. I to the beneficiary under the Deed of Trust described in Item No. 5 above. THIS IS AN ESCROW ONLY. NO TITLE INSURANCE IS REQUIRED AND YOU AS ESCROW AGENT SHALL NOT HAVE ANY REQUIREMENT TO INVESTIGATE TITLE ON ANY OF THE PROPERTY OR DOCUMENTS DESCRIBED HEREIN. Above Mr. Courtney's signature appeared the following: We hand you herewith the documents and funds described in Items No. 1, 2, 4 and 5 above and you are hereby authorized and instructed to deliver all of these documents when you hold for our account the Deed described in Item No. I. Under date of January 7, 1972, a document entitled "Deed of Trust with Assignment of Rent" was executed by Mr. Utter and Mr. Courtney as trustors. This deed of trust, which recites that it is between *32 C.C. Utter and Walt Courtney and First American Title Co. of Nevada, trustee, and Millett Ranch, Inc., beneficiary, described the Blue Springs Ranch. By a document entitled "Agreement for the Acquisition of Property" dated January 15, 1972, Mr. Utter and Mr. Courtney waived all claims of any kind that either of them might have with reference to Blue Springs Ranch and the escrow agreement they had entered into.The document states that they were at all times acting as agents for MLC as principal. The agreement provides that MLC will make available all funds required for the acquisition of the property. The agreement further provides that MLC will pick up all rights under the escrow and incorporate them into the Monitor Livestock holdings. Both Mr. Utter and Mr. Courtney signed the agreement on their own behalf, and Mr. Utter signed as president of MLC. A document entitled "Lease," dated November 10, 1972, provided that Mr. Thompson leased to MLC all deeded acres of Triple T Ranch plus all land leased from the Bureau of Land Management and/or United States Forest Service. The document states a term of 5 years from November 1, 1972 through October 31, 1977, for a "total rental" *33 of $55,000, payable $11,000 per year with annual payments to commence on October 31, 1973. Under date of November 10, 1972, Maryelle Corp. and Roy L. Thompson entered into an agreement entitled "Option to Acquire Real and Personal Property." This agreement was signed by Michael G. Chatzky, president on behalf of the Maryelle Corp., and by Roy L. Thompson on his own behalf. Mr. Chatzky was a lawyer in Mr. Margolis' office. This document recited in part as follows: The subject of this option consists of the following items: a. Approximately 1,337 deeded acres located in Nye and Lander Counties, Nevada, * * * [the Triple T. Ranch]. b. 1,763 animal units months now attached to the property, all considered class 1. c. There are no forest rights. d. All of the equipment now located on the premises, an inventory of which is attached hereto and incorporated by this reference as if fully set forth herein. e. All of the improvements, fixtures and related items now located on said premises. This option is subject to the following express conditions: a. Under no circumstances shall optionee have any right to exercise this option prior to the deposit of $100,000 by optionee *34 with optionor or prior to the death of the optionor or optionor's wife, whichever shall first occur. b. Optionee has contemporaneously herewith delivered to optionor $20,000, which shall constitute the first deposit on the option, subject to all of the provisions of this agreement. c. Optionee shall deposit with optionor $5,000 in the month of January of 1973 and $5,000 in the month of February of 1973 and $3,000 or more each month thereafter until the option shall have been exercised or until the option shall have come to an end. d. The option must be exercised by the optionee at such time as $100,000 has been deposited with optionor, unless the optionee shall have advised the optionor thirty days prior to the last deposit due on such $100,000 that optionee elects not to exercise the option. In such event, optionor shall dispose of the property at optionor's own discretion and shall apply the total paid on the option by optionee in order to eliminate any and all damage which optionor may have suffered by virtue of the option and shall return the balance if any to optionee. e. Optionee shall give optionor thirty days' written notice that optionee elects to exercise the *35 option granted under this agreement. All necessary calculations shall be made within such thirty day period, and all necessary payments required hereunder shall be adjusted as between the parties on the thirtieth day. f. The purchase price for all of the assets which are the subject of this option shall be $250,000. * * * Maryelle Corp. is a California corporation that in the 1960s was owned by Elaine Fischel, an attorney who was associated with Mr. Margolis. Ms. Fischel disposed of the Maryelle Corp. to ABC in 1969 or 1970, and in 1972 Maryelle Corp. was owned by ABC. A letter from MLC signed by Mr. Utter as president to Mr. Thompson, dated July 23, 1975, states in part as follows: The apologies of the undersigned in Monitor Livestock Company are yours for failure to have placed in official written form prior hereto the details of the exercise of the Triple T option, when notice was given to you almost a year ago. We hope that the attached accounting will not have inconvenienced you unduly. You should be aware that this corporation is about to be liquidated, but that provision has been made for the continuation of payments to you from World Entertainers, a Bahamian *36 Limited Liability Company. Such payments will be further guaranteed by Aruba Bonaire Curacao Trust Company Limited, a Bahamian Trust Company. In 1974 or 1975 Maryelle Corp. liquidated, and Associated Convalescent Enterprises (ACE) acquired its assets and liabilities. ACE is a California corporation which was wholly owned by Maryelle Corp. prior to the liquidation of Maryelle Corp. Mr. Utter, Mr. Courtney and Mr. Margolis had contemplated that Mr. Utter and Mr. Courtney would jointly operate the Monitor Ranch complex. The Utters and the Courtneys moved onto the Monitor Ranch in May 1971, residing in separate houses on the ranch. In September or October 1972, the Courtneys moved to the Triple T Ranch. The Utters continued to reside on the original Monitor Ranch property. Mr. Utter and Mr. Courtney were each paid a salary. Checks for this salary were drawn on an account denominated "Monitor Ranch." When operating the Monitor Ranch, Mr. Courtney and Mr. Utter operated primarily under the name "Monitor Livestock." Forest Service and Bureau of Land Management grazing permits were issued primarily to MLC. Occasionally because MLC had reached the upper limit of the number of *37 permits allowed one entity, permits were obtained in the name of Mr. Courtney or Mr. Utter. A memorandum written on the letterhead of Mr. Margolis, dated July 7, 1973, entitled "Monitor Ranch Meeting" states as follows: The meeting commenced at approximately 10:30 A.M. at the Pioneer Hotel, Reno, Nevada. Those present were: Walt and Carole Courtney, Chug and Jane Utter, Fairy Utter, John Arden, Archie Granada, Harry Margolis, Robert Dunnett and Doxie Gore. There was a general discussion for approximately two hours concerning the entire background and history of the Ranch in which everything was discussed from the financial contributions of everyone and the work and care which Chug and Walt put into the property as well as any of the disputes between the parties. After several alternatives were suggested for the future, it was finally agreed that for the next two years, Walt will live on the ranch on a permanent basis and will generally be in charge of everything. Chug will live on the Monitor Ranch during those months of the year when it is relatively warm and there is no snow. Walt would receive $1,000.00 per month salary and Chug would receive $1,000.00 per working month *38 while living on the ranch, plus $2,000.00 per month in any event for the entire year. When the obligations owed on the various properties have been reduced and the Ranch has turned the corner and is making money, the salaries will be adjusted and the fringe benefit program will also be increased. Walt will be in charge of the operation but will consult Chug frequently, and both Chug and Walt will be meeting monthly with Fairy in Reno to go over the prior months operation, discuss the current month and plan for the next 30 days. Fairy's signature will be added to that of Walt and Chug on the bank account. The above described procedure was agreed upon in order to give Walt an opportunity to show his capability of running the Ranch single handily [sic]. In two years, a decision will be reached as to final disposition of the Ranch among Walt, Chug and possibly Harry should the decision be reached by Walt and Chug to participate 1/3, 1/3, 1/3 instead of 1/2 each with Harry's contributions being 10% loans. This decision will be relayed by Chug and Walt to either Bob, Harry or Doxie. It was agreed that Walt would receive credit on his accounting for $127,762.00 as the value of *39 the cattle which he brought from Grass Valley to the Monitor. This amount will be reduced by payments which Monitor made to Production Credit Corp. The net figure is shown on the attached summary of actual payments. The Chanslor office will continue doing the accounting and Harry will answer Granada's questions about the 1971 and 1972 returns and the 1972 return will be corrected and filed. It was suggested and agreed upon that the trustees meet approximately twice a year and that they receive $100.00 for each meeting. It was also agreed upon that Fairy should be compensated in some way for her monthly meeting with Chug and Walt. No specific dollar amount was determined and the question was left open. There was extensive discussions of the agreements to be executed by the trustees and the trustees signed several operating documents. No date was set for the next meeting and the meeting adjourned at approximately 5:00 P.M. A memorandum on the letterhead of Mr. Margolis, dated September 25, 1973, entitled "Monitor Ranch Memo" and addressed "Dear Trustees, Chug and Walt," states as follows: The purpose of this memo is to review matters as of this date and to set the *40 basis for a constructive discussion at a meeting to be held at the Fairy Utter residence in Reno at 10 a.m. Tuesday, October 9. You will recall that a meeting was held on July 7th in Reno and that plans for the balance of the year and for some time into the future were agreed upon. It may be useful to list them briefly here. 1. The basic salary or compensation for Chug and Walt would be $1,000 per month whether it was drawn or not. A separate situation would be set up for Chug during those months when Chug and Jane would presumably be living in town. This was arranged on the basis that the winter was hard for them on Monitor and that they would be away from the ranch five or six months during the winter. The payment would be increased during the period that Chug and Jane were in town because $1,000 would not be sufficient. As to this last point, the notes are unclear, and I believe this point should be cleared up now. Are Chug and Jane planning to be on Monitor through the winter or are they going to town, and if so, when? What amount will Chug and Jane require for those months in town as contrasted with those months when they are on Monitor? It is my impression, for whatever *41 it may be worth, that the salary or compensation was to be $1,000 per month on the ranch because of the fact that the cost of living would be less and $2,000 per month while in town because the cost of living would be a great deal more. 2. The notes suggest that there were to be some adjustments in salary and fringe benefits when the ranch had turned the corner and was making money. This appears to me to be unclear and probably also should be discussed with an eye to agreement as to what should be done in this regard in the furture. 3. There was agreement that Walt would have over-all responsibility for operations, in consultation with Chug. The way in which this has functioned to date should be reviewed, particularly in view of the things that remain to be done before winter is fully here and looking to the winter and on into the spring. I have here in mind actual operations in terms of employees and the work that has to be done. Apparently there was difficulty with reference to Les Boyd leading to a situation in which Boyd apparently quit, and this type of situation makes operations very difficult and a discussion of the problem might make it possible to eliminate these *42 difficulties or at least to limit these difficulties in the future. 4. It had been planned to put off any final disposition of the ranch for some little time. It appears that Chug has been discussing the possibility of disposing of the ranch or ranches with a wide variety of people, and this appears to make good sense. It is my view that the ranch should be listed with a variety of brokers on a none-exclusive basis at $2,000,000, plus the fair market value of the cattle, with the thought that any offer could then be considered. There should be no misunderstanding about any broker's fee to be paid, either to Chug or to anyone else who may sell the ranch, and this ought to be discussed at the meeting so it would be clear what Chug expected, if anything, so that a net return could be kept clearly in mind. 5. Operations have stayed within budget the past number of months. The current budget should be reviewed through next spring taking into consideration what sales would be made in the next sixty days and looking to probable cash flow prior to major selling in 1974. This budget should include the January Bozarth, Federal Land Bank and Bureau of Land Management payments. 6. *43 The 1973 books and records should be up to date and should be examined during the meeting. It will be important to do a rundown on the books and records in November so as to do proper planning for tax purposes before the end of the year. Planning had contemplated the bringing to an end of the Monitor Corporation and it could be that it would be desirable to do this before the end of the year. It will probably thus be desirable to have a meeting to discuss the planning as soon as it is developed by our office. 7. We hope to have the over-all accountings brought up to date through the end of September for consideration at the meeting of the 9th. 8. Certain items shall require the signature of Martin Besso and it would be appreciated if any of you would talk to him to ask him to return the signed documents as soon as possible. 9. The signature of Fairy Utter was to be added to the bank account as a matter of convenience, and this should be done no later than the 9th. 10. There has been agreement on arrangements of one-third, one-third, one-third, so that aspect of the matter is behind us. 11. It had been planned to have the trustees meet twice a year. The next meeting *44 should probably be in January. It might make sense to have someone other than Martin Besso as the third trustee, but, perhaps, the January meeting could be scheduled when Besso could plan to be in Reno. Please discuss this at the meeting on the 9th and let us know what is agreed upon. A document entitled "Agreement for the Assignment of Options" signed on behalf of ACE by Michael G. Chatzky, president, and MLC by C. C. Utter, president, recites in part as follows: This Agreement is entered into this 8th day of July, 1974, by and between ASSOCIATED CONVALESCENT ENTERPRISES, a California corporation hereinafter referred to as ACE, and MONITOR LIVESTOCK COMPANY, a Nevada corporation, hereinafter referred to as MONITOR. The subject of this Agreement is that certain option to acquire real and personal property dated November 10, 1972, entered into between the MARYELLE CORPORATION and Roy L. Thompson, a copy of which is attached hereto and incorporated by this reference as if fully set forth herein. ACE now holds the rights of the MARYELLE CORPORATION under said Agreement and now wishes to dispose of said rights to MONITOR. Under the premises, the parties hereby agree as follows: *45 1. ACE shall continue to make all of the payments provided for under the option until further notice is given to ACE by MONITOR that MONITOR has notified Roy L. Thompson of the exercise of the option or September 30, 1974, whichever is earlier. 2. Effective with the date of exercise of the option by MONITOR, or September 30, MONITOR shall pay to ACE the total book value of the option to ACE plus 10% interest on the sum of Two Hundred and Fifty Thousand Dollars ($250,000) for a period of eighteen (18) months which the parties agree is Thirty-Seven Thousand Five Hundred Dollars ($37,500). Such sum must be paid by MONITOR to ACE no later than the 30th day of September.In addition thereto, MONITOR must pay to ACE before the 30th day of September, the full book value of the option as shown on the books of ACE. Effective with the two payments noted, all of the rights of ACE in and to the option should now belong to MONITOR and they shall cooperate in every way with MONITOR to ensure the free and complete enjoyment of such rights by MONITOR. It is expressly understood that MONITOR will assume all of the obligations under the option and that ACE shall have no further liabilities *46 from and after September 30 in any event. Monitor Ranch Partnership (MRP) was a general partnership formed by Mr. Margolis in an effort to acquire new financing for the Monitor Ranch after the acquisition of the Triple T and Blue Springs ranches. All the partners involved in MRP were clients of Mr. Margolis whom he knew personally. Mr. Margolis was totally responsible for the formation of this partnership. Under date of December 5, 1973, a document entitled "Agreement for the Lease of Livestock and Ranches/Option to Purchase" was signed on behalf of MLC and MRP. This document provided in part as follows: WHEREAS, MONITOR owns or has the right to acquire three (3) adjacent ranches known as Monitor Ranch, Blue Springs Ranch and Triple T Ranch; and, WHEREAS, PARTNERSHIP [MRP] desires to lease said ranches and the cattle thereon and the houses, fences, barns, sheds and other affixed improvements. NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: 1. An express condition of this Agreement is that PARTNERSHIP pay MONITOR one Hundred and Fifty Thousand Dollars ($150,000.00) for approximately fifteen hundred (1,500) tons of hay *47 now found on the ranches. Time is of the essence, and this purchase must be completed before the end of 1973 or this entire Agreement shall be null and void. 2. PARTNERSHIP hereby leases the property and cattle which is the subject of this Agreement from MONITOR at an annual rental of One Hundred and Fifty Thousand Dollars ($150,000.00) payable on or before the 30th day of November of each succeeding year. The first One Hundred Fifty Thousand Dollars ($150,000.00) shall be paid as indicated herein in the year 1974. The cattle included in this lease are more particularly described in Exhibit A attached hereto and incorporated by this reference as if fully set forth herein. The improvements included hereunder are more particularly described in Exhibit B attached hereto and incorporated by this reference as if fully set forth herein. PARTNERSHIP acknowledges that the properties being delivered are in a reasonable state of repair and nothing further shall be required of MONITOR in connection with such properties. MONITOR acknowledges that the remaining life of such properties may well not exceed thirty (30) years and, therefore, MONITOR agrees in advance to accept the improvements *48 at the conclusion of this lease regardless of the condition in which the improvements may be at that date. Both parties recognize that the appraisers, should PARTNERSHIP desire to exercise the option to buy, may choose to give no value to the improvements which are described in Exhibit B. The grazing rights included hereunder are more particularly described in Exhibit C set forth at the conclusion of this document and incorporated by this reference as if fully set forth herein. MONITOR warrants that the grazing rights will be in full force and effect at all times during the life of this lease. Should such grazing rights be lost through any default on the part of PARTNERSHIP, the parties agree that liquidated damages shall be paid by PARTNERSHIP to MONITOR. Damages shall be based upon the then value of feeding rights for one cow for one month, using the then price of hay on site delivered to MONITOR. Such damages shall be multiplied by the number of cows and number of months represented by the grazing rights lost. The total shall further be multiplied by three (3) representing three (3) years in which it is presumed MONITOR might be in a position to recover the rights so lost. *49 Should any grazing rights be lost without the responsibility of PARTNERSHIP, PARTNERSHIP may give notice to MONITOR that PARTNERSHIP intends to bring this lease to an end. MONITOR shall then have thirty (30) days within which to recover the lost grazing rights, or to substitute other grazing rights for the rights lost, or to agree to supply feed equivalent to the grazing rights lost. Should MONITOR complete such undertaking within such thirty (30) day period, this lease shall go forward without change and PARTNERSHIP shall have no right to terminate this lease on such grounds. Should MONITOR fail to guarantee the continuing grazing rights or their equivalent, PARTNERSHIP may at the end of thirty (30) days remove from the ranch all property belonging to PARTNERSHIP, and all cattle in excess of the cattle covered by this lease, and PARTNERSHIP shall then turn over the ranches to MONITOR and all of the rights of the parties against each other shall come to an end. * * * 4. The term of this lease shall be thirty (30) years. PARTNERSHIP shall have the option to buy the property and cattle which is the subject of this lease by giving notice of the exercise of such option at any *50 time during the 29th year of this lease. Such notice shall be given in writing. The purchase price under such option shall be the fair market value of the leasehold property as of the 1st day of January next preceding the termination date of this Agreement. Such fair market value shall be determined by professional appraisers retained by the parties. Such appraisers shall follow, as a model, the current appraisal MONITOR has obtained and supplied to PARTNERSHIP. 5. All costs of operations of the ranches throughout the life of this lease shall be for the sole account of PARTNERSHIP so that this lease shall be net in all respects. This shall include taxes, insurance, repairs and maintenance and all other items. This agreement was executed on behalf of MLC by Mr. Utter as president and on behalf of MRP by Mr. Margolis as "Harry Margolis, a Professional Corporation, "Partner." A document entitled "Addendum to Agreement for the Lease of Livestock and Ranches," dated November 29, 1974, signed for MLC by Mr. Utter as president and for MRP by Mr. Margolis as president of Margolis, Chatzky and Dunnett, a Professional Corporation, states in part: The agreement between the parties *51 of December 5, 1973, is ambiguous as to the repayment of improvements to existing property and construction of additional property, and the parties desire to eliminate that ambiguity. 1. It was at all times understood that corporation would bring the ranch into operating condition by the addition of necessary fencing, barns and related items. These are not to exceed fifty thousand dollars ($50,000.00) in total cost and are to be completed for partnership within twenty-four (24) months from the date of the original agreement. 2. The partnership is to pay for all maintenance and repair of existing structures and for the maintenance and repair of structures to be built and paid for by corporation. During 1975, problems developed between Mr. Courtney and Mr. Utter in the operation of the Monitor Ranch. The problems continued to the point that all parties concerned decided to attempt to sell the ranch and to go to arbitration to determine the disposition of the proceeds of the sale. An agreement was entered into under date of July 12, 1976, signed by C. C. Utter; Jane Utter; Fairy Utter for the Martin Trust; C. C. Utter for MLC; Walter A. Courtney, Carole Courtney, Harry Margolis, *52 Kenneth Reiserer for NEP; and Robert L. Dunnett for MRP. This agreement provided as follows: THIS AGREEMENT is entered into by and among C. C. UTTER, JANE UTTER, THE MARTIN TRUST, MONITOR LIVESTOCK COMPANY, WALTER A. COURTNEY, CAROLE COURTNEY, HARRY MARGOLIS, NEVADA ENTERPRISES PARTNERSHIP and MONITOR RANCH PARTNERSHIP on this 12th day of July, 1976. The PARTIES to this AGREEMENT are those who have or claim to have any direct or indirect interest in the properties known as The MONITOR RANCH, BLUE SPRINGS RANCH and TRIPLE T RANCH (hereinafter collectively referred to as The RANCH), and the NORTHUMBERLAND PROPERTY and all real and personal property plus all livestock, improvements, leases, AUMs, equipment, vehicles and anything else belonging to The RANCH. The PARTIES to this AGREEMENT agree to dispose of the RANCH properties in a manner fair to all. 1. Everything shall be offered for sale, excepting: A. Personal items belonging to any of the PARTIES--inventories to be attached hereto within fifteen (15) days from the execution of this AGREEMENT; and B. The Northumberland Property, consisting of one hundred thirty-seven (137) acres, more or less, or any of the water or *53 mineral rights, etc., on this said property. The Northumberland Property and all rights attached thereto shall be withheld from the sale and shall be retained on the basis of one-third (1/3) to C. C. UTTER or his nominee, one-third (1/3) to WALTER A. COURTNEY or his nominee, and one-third (1/3) to HARRY MARGOLIS or his nominee. The exact details will be worked out within the existing entities. This Northumberland Property shall be under the control of the RANCH Manager, until such time as the RANCH Properties are sold. Immediately after such sale, a meeting shall be held by the PARTIES to determine the future of the Northumberland Property. The PARTIES intend to cooperate, looking toward the maximization of the economic benefit of each property. Fifty percent (50%) of all mineral rights and all geothermal rights on the balance of the RANCH properties shall be retained by the PARTIES for a period of fifteen (15) years at which time if nothing has been done with the rights, said rights shall revert back to the property. The ownership shall be the same as the Northumberland Property. 2. The RANCH properties shall be listed on an exclusive net basis to not more than two cooperative *54 brokers at any one time, for a period not to exceed six months unless otherwise agreed upon. A. The brokers shall be agreed upon by all the PARTIES. B. C. C. UTTER has suggested a net sales price of Two Million Five Hundred Thousand Dollars ($2,500,000.00) subject to the approval of all of the PARTIES. In no event shall the sales price be less than the total investments of all of the PARTIES in all of the properties for all of the periods of time in which any of them have been involved, plus ten percent (10%) simple interest on all such sums for all such periods, plus the existing mortgages. The total investment of each party shall be adjusted according to what the bookkeeping records reflect and such investment shall be approved by all of the PARTIES. C. Any of the PARTIES to this AGREEMENT may make a bona fide offer to purchase the RANCH properties from any of the remaining PARTIES at any time. Any and all offers to purchase the RANCH properties shall be submitted to all of the PARTIES to this AGREEMENT in writing. D. ALL PARTIES to this AGREEMENT agree to cooperate and aid in any and all ways to make an acceptable sale of these RANCH properties. E. Any of the PARTIES *55 to this AGREEMENT may make the sale of the RANCH properties themselves and be entitled to retain any consideration (including commission) in excess of the net sales price. 3. From and after the date of execution of this AGREEMENT, C. C. UTTER shall manage the RANCH properties until sold or until C. C. & JANE UTTER'S and THE MARTIN TRUST'S interests in the properties are purchased. Mr. UTTER shall have authority over all operations subject to the following conditions: A. Only bills pertaining to the RANCH operations will be paid from Operating Funds. (1) Operating Funds shall be described and defined as funds obtained from the sales of livestock, equipment, hay, or any other commodity owned by the RANCH properties, or any other source of funds, as necessary to the operation of the RANCH properties until sold so long as all livestock sales are approved in writing in advance by WALTER COURTNEY. (2) Said Operating Funds shall be placed in an Operating Account controlled by the Manager. A single signature shall be sufficient on such account and it is intended that the signature be that of the Manager. (3) The Manager shall make a monthly report to all PARTIES of the activities *56 of the Operating Account. Formal books and records shall be kept by HARRY MARGOLIS and the Manager shall supply complete information which is normally found as proper and essential to the keeping of the books and records; and all PARTIES shall have unlimited access to all books and records at any time. B. The UTTER family and the COURTNEY family may continue to live on the properties and shall each receive $750.00 per month, actual draw, and $750.00 per month shall accrue to each on their respective investments in the RANCH properties, subject to the following conditions: (1) C. C. UTTER shall perform all necessary management duties. (2) WALTER COURTNEY shall perform whatever necessary cooperative work is required in order that the RANCH properties do not have to support unnecessary help. (3) The RANCH shall pay for Manager's telephone expense excepting personal calls. (4) The care and maintenance of any and all personal property shall be paid for by the owner(s) of such property unless agreed upon by all PARTIES. (5) The PARTIES shall meet bimonthly. This meeting can be held via conference telephone call. The first such meeting shall be held before July 15, 1976. *57 (6) A complete inventory of all vehicles and equipment that has been purchased and is being purchased by the RANCH since May, 1971, shall be furnished to the Manager within fifteen (15) days from the date of execution of this AGREEMENT in order to determine exactly what is necessary for the RANCH operation. (7) Prior to or upon an accepted offer of the sale of the RANCH properties, or upon the sale(s) of any equipment, vehicles or other assets set forth in 3.A(1) above, all parties shall be willing and able to execute and deliver all Deeds, Titles, Bills of Sale or any and all other documents necessary for the completion(s) of the transaction(s). All legal responsibilities for such execution and delivery shall be entrusted to Margolis, Chatzky & Dunnett, who shall be entitled to charge reasonable fees for services rendered. All of the parties to this AGREEMENT will cooperate in every respect to execute whatever documents are necessary to resolve title and other problems provided only that nothing shall be done which will ultimately undermine the intent of this AGREEMENT or work to the detriment of any of the PARTIES to this AGREEMENT. It is contemplated that action will go forward *58 as rapidly as possible with reference to clearing title to the Northumberland property. (8) It is recognized by the PARTIES that THE MARTIN TRUST presently holds that portion of the proceeds of the Columbia River Promissory Note and the security thereon over the first Two Hundred Thousand Dollars ($200,000.00) collected. THE MARTIN TRUST has the right to collect and receive the monies in excess of the first Two Hundred Thousand Dollars ($200,000.00) without any claim to said funds by any of the other parties hereto. (9) In the event that Mr. UTTER shall die or become incapacitated before the sale of the RANCH properties as set forth in this AGREEMENT, it is expressly understood and agreed to that his heirs and assigns shall be entitled to the full benefit and use of Mr. UTTER'S interests herein. In such event, the PARTIES hereto shall agree on a RANCH Manager for the RANCH properties until sale. (10) Upon the sale of these RANCH properties, all monies shall be placed in an account at The First National Bank in Reno under the direction of all the PARTIES, their heirs or assigns whereas it shall draw interest. Each interested Party's share shall be determined within ninety (90) *59 days from the completion of the sale. The First National Bank shall then be authorized by all PARTIES to disburse said monies accordingly to the PARTIES or to their heirs or assigns. (11) All sums contributed to or extended for the properties by any of the PARTIES hereto shall be first returned to the PARTIES or their nominee with interest at the rate of eight percent (8%) through 12/31/73, at ten percent (10%) for the year 1974, and at eight percent (8%) through 1976. Interest thereafter shall be calculated at two points above the Bank of America prime rate. The PARTIES shall each present to the others their calculations of the sums due for the period ending 5/31/76. If there is any dispute as to such amounts, the PARTIES agree to independent arbitration as set forth in Paragraph 12. However, nothing in this paragraph shall prevent any party from accepting less than his share of the contributed sums. (12) Any disputes that may arise with reference to this AGREEMENT shall be placed in writing by any of the PARTIES to this AGREEMENT. Such disputes shall be settled among the PARTIES if that is possible. If it does not prove possible, such dispute shall be held for settlement *60 by an independent arbitrator to be selected by the PARTIES. The rules of American Arbitration Association shall apply. All costs of arbitration shall be charged to the PARTIES. (13) Those portions of the property retained by WALTER COURTNEY and C. C. UTTER for residential purposes shall be out of the control of the Manager. Either C. C. UTTER or WALTER COURTNEY shall pay as decided upon for reasonable use of any property beyond residential purposes. (14) It is unqualifiedly a condition of this AGREEMENT that all PARTIES shall conduct themselves honorably, responsibly, cooperatively and with integrity toward one another. (15) An animal count shall be conducted by air as soon as possible after the execution of this AGREEMENT.Such count shall be verified by an actual head count in February 1977. Any party shall have the right to conduct a hand tagged count at his own expense. (16) This AGREEMENT shall be binding upon the successors in interest to the PARTIES. Under date of August 16, 1977, the parties to the July 12, 1976, agreement entered into the following supplemental agreement with respect to the Monitor Ranch property: WHEREAS, the parties hereto wish to make a *61 further agreement modifying and adding to said July 12, 1976 agreement. NOW THEREFORE, for and in consideration of the execution hereof, the parties hereto agree as follows: 1. This agreement shall not replace the agreement of July 12, 1976 but shall be an addition thereto except that to the extent that the provisions of this agreement are in conflict with or are inconsistent with the terms of the agreement of July 12, 1976, this agreement shall control. 2. The ranch shall be sold as expeditiously as possible at the best price and terms reasonably obtainable but any party hereto may purchase the property upon the following terms, may require the property be sold upon the following terms and if a bona fide offer is received from a third party to purchase the property upon the following or better terms, the ranch shall be sold. The minimum terms are: a. A net price (price after the payment of commissions) of $1,600,000.00 for all of the ranch assets other than the cattle plus the then reasonable market price of the cattle, such sale to exclude the Northumberland Property which shall be retained. b. The price shall be payable: 1.By the assumption of the existing Federal *62 Land Bank Mortgage. 2. By payment in cash of the reasonable market price of the cattle. 3. By a down payment of 30% of the sales price of the ranch assets other than the cattle less the assumption of the existing Federal Land Bank Mortgage. 4. And the balance of the purchase price together with interest at 8% per annum in ten (10) equal annual payments with the deferred price to be secured by a deed of trust upon the land, second only to the Federal Land Bank Mortgage, and a security agreement on all personal property, additions and replacements thereof. 3. Robison Realty and Insurance Co., 475 So. Arlington Avenue, Reno, Nevada, real estate brokers shall be given an exclusive agency listing for ninety (90) days to sell the ranch. 4. This agreement is made without prejudice to the arbitration proceedings in which the parties are now involved respecting the agreement of July 12, 1976. 5.Any disputes that may arise with reference to this agreement shall be placed in writing by any of the parties to this agreement and such disputes shall be settled among the parties if that is possible. If it does not prove possible, such dispute shall be held for settlement by an independent *63 arbitrator to be selected by the parties. The rules of the American Arbitration Association shall apply. All costs of arbitration shall be charged to the parties. Orville Wilson shall be the arbitrator of such disputes unless Mr. Wilson is unwilling to so serve. This agreement was signed by C. C. Utter; Jane Utter; the Martin Trust by Fairy Utter; MLC by C. C. Utter, president; Walter A. Courtney;Carole Courtney; Harry Margolis; NEP by R. H. Adolphson; and MRP by Michael Chatzky. Mr. Adolphson was employed in Mr. Margolis office during 1977. In a document entitled "Notice of and Demand for Arbitration," Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP gave notice to C. C. Utter, Jane Utter, and Fairy Utter that they intended to arbitrate disputes that had arisen under the agreement dated July 12, 1976. The "Notice of and Demand for Arbitration," which was signed by Robert L. Dunnett as attorney for the Courtneys, Harry Margolis, NEP and MRP, stated that copies of the document had been forwarded to the San Francisco regional office of the American Arbitration Association, and that office had been requested to commence selection of an arbitrator. The document *64 contained the following statement with respect to the nature of the matter to be arbitrated: The nature of the dispute involves the interpretation and intention of the parties in managing and operating certain ranching properties pursuant to the agreement attached hereto [the July 12, 1976 agreement]. The properties were to be managed and operated pending sale and division of the sale proceeds among the parties claiming an interest in the properties. The dispute concerns the respective financial and ownership interests of each of the parties to the agreement as well as the responsibilities and liabilities for the operation of the ranch properties. Virtually every provision of the agreement is in dispute. The amount involved cannot be stated at this time since one of the remedies requested is an accounting. The parties requesting this arbitration seek an accounting among the parties in order to establish the financial interest of each, a determination of the ownership interests among the parties, the appointment of a manager to operate the properties and supervise the sales thereof and an ultimate determination of the distribution of the proceeds upon sale. A document entitled *65 "Answer to Notice of and Demand for Arbitration" was filed on October 29, 1976, by Frank R. Petersen as attorney for C. C., Jane and Fairy Utter with the San Francisco regional office of the American Arbitration Association "In the Matter of the Arbitration between Walter Courtney, Carole Courtney, Harry Margolis, Nevada Enterprises Partnership and Monitor Ranch Partnership / and Fairy, C. C. and Jane Utter, / Case No. 74-10-0169-76." In this document the Utters agreed that the dispute concerned the respective financial and ownership interest of each of the parties to the agreement, as well as the responsibilities and liabilities for the operation of the ranch property. In 1977, a firm of certified public accountants was engaged to assist Mr. Margolis in calculating some of the amounts relating to the arbitration involving the Monitor Ranch. This firm prepared a document entitled "Monitor Ranch Special Report for Margolis, Chatzky & Dunnett, a Professional Corporation (Unaudited), May 1, 1971 to December 31, 1976." This report is dated March 5, 1977. The report refers to "various investors, creditors, debtors, etc.," who engage in financing transactions with "operating entities. *66 " One of the financing entities listed in this report is NEP. This report states in Note A, in part: On July 12, 1976, the parties indicated in Note B by an asterisk (*) signed an agreement which provides in part that they ". . . agree to dispose of the RANCH properties in a manner fair to all." (Page 1 of the agreement.) The portion of the agreement pertinent hereto is contained in paragraph (11) * * * which provides "All sums contributed to or extended for the properties by any of the PARTIES hereto shall be first returned to the PARTIES or their nominee . . ." The purpose of this report is to assist Margolis, Chatzky & Dunnett, A Professional Corporation, whom we have been informed represents Walter A. and Carole Courtney, Nevada Enterprises Partnership, Monitor Livestock Company, Monitor Ranch Partnership, Harry Margolis, and other entities represented by these parties, in determining "all sums" as referred to in the quotation included in the preceding paragraph. Because of the nature of the information and its presentation, * * * the use of this report is limited to this purpose. Note B of the accountants' report contained the following explanation of the listing of *67 the various individuals and entities in lieu of using their full name. The abbreviations used within the report were as follows: NOTE B - IDENTIFICATION OF ENTITIES Abbreviation
Full Name
ABC
Aruba Bonaire Curacao Trust Company Limited
ABL
Antigua Banking Limited
ACE
Associated Convalescent Enterprises
ADC
Anglo Dutch Capital Company
BH
Bel Haven Leasing
Bonaire
Bonaire Development Company
Courtney
Walter A. Courtney * and Carole Courtney *
HM
Harry Margolis *
HM, APC
Harry Margolis, A Professional Corporation
(subsequently Margolis, Chatzky & Dunnett,
A Professional Corporation and referred to
as such throughout the report)
IAL
International Aesthetics Limited
KM
Ken Margolis
Martin Trust
The Jewell Martin Trust *
MDC, APC
Margolis, Chatzky & Dunnett, A Professional
Corporation (formerly Harry Margolis, A
Professional Corporation)
Maryelle
Maryelle Corporation
Merrimac
Merrimac Corporation
MLC
Monitor Livestock Company *
MRP
Monitor Ranch Partnership *
MRP Partners
The partners in Monitor Ranch Partnership
NEP
Nevada Enterprises Partnership *
Utter
C.C. Utter *, Jane Utter * and Fairy Utter
*68 In the report, Monitor Ranch transactions involving Bonaire; IAL; Anglo-Dutch Capitol Co. (ADC); Maryelle; Margolis Chatsky & Dunnett, a Professional Corporation; Harry Margolis; Antigua Banking, Ltd. (ABL); ABC; ACE; Ken Margolis; and Bel Haven Leasing (Bel Haven) were listed under the heading "Margolis, et al." Of the 204 transactions reflected in the "Margolis, et al." column in the accountants' report, 20 involved ABC, 97 involved ABL, 24 involved the Margolis law office, 16 involved Maryelle, 15 involved Bonaire, 9 involved IAL, 8 involved Ken Margolis, 7 involved ACE, 5 involved ABC, 2 involved Harry Margolis, and 1 involved Bel Haven. Bonaire and Maryelle were included in the "Margolis, et al." column because they were owned by ABC, and Mr. Margolis was given credit for transactions by ABC because his foreign trusts were with ABC. The accountants' report reflected the following "Totals for Period May 1, 1971 to December 31, 1976," for each of the Monitor Ranch financing entities: Martin Trust
$200,000 Utter
(23,377)
Courthey
(27,831)
MRP Partners
169,000 NEP
227,913 Margolis, et. al.
754,671 *69 The following is a summary of the Monitor Ranch transactions involving NEP as recorded in the accountants' report: Operating Entities
Financing Entities
Description
MRP
NEP
12/30/74
Purchase of cattle
from MRP
$250,000 $250,000 10/20/75
Rent on lease
of Monitor Ranch
( 40,000)
( 40,000)
10/30/75
Rent on lease
of Monitor Ranch
( 5,000)
( 5,000)
10/31/75
Rent on lease
of Monitor Ranch
( 5,000)
( 5,000)
12/26/75
Purchase of cattle
from MRP
68,000 68,000 12/30/75
Cattle management
fee paid to MRP
185,110 185,110 12/30/75
Sale of cattle
to MRP
( 62,697)
( 62,697)
12/31/75
Rent on lease
of Monitor Ranch
(112,500)
(112,500)
12/20/76
Rent on lease
of Monitor Ranch
( 50,000)
( 50,000)
The following schedule sets out all of the December 30, 1974, Monitor Ranch transactions as shown on the accountants' report: Operating Entities
Financing Entities
Margolis, et al.
Description
MLC
MRP
NEP
Entity
Amount
Purchase of
cattle from MRP
$250,000 $250,000
Loan repayment
(102,000)
ABL
$ (102,000)
Purchase of vehicles
and equipment
$31,208 ( 31,208)
Repayment of
advances
111,941 (111,941)
Interest payment
4,752 ( 4,752)
Capital contribution
to Bel Haven
(145,000)
BH
(145,000)
*70 The following schedule sets out all of the October 20, 1975, Monitor Ranch transactions as shown on the accountants' report: Operating Entities
Financing Entities
Margolis, et al.
Description
MLC
MRP
NEP
Entity
Amount
Interest payment
$2,767 ABL
$2,767 Loan
$85,000 ABL
85,000 Rent on lease of
Monitor Ranch
45,000 (45,000)
Rent on lease of
Monitor Ranch
(40,000)
$ (40,000)
Loan repayment
with interest
(44,873)
ABL
(44,873)
The following schedule sets out all of the October 30 and 31, 1975, Monitor Ranch transactions as shown on the accountants' report: Operating Entities
Financing Entities
Margolis, et al.
Description
MLC
MRP
NEP
Entity
Amount
10/30/75
Loan
$5,000 ABL
$5,000 Loan
60,000 ABL
60,000 Rent on lease of
Monitor Ranch
( 5,000)
$ (5,000)
Rent on lease of
Monitor Ranch
$55,000 (55,000)
10/31/75
Rent on lease of
Monitor Ranch
( 5,000)
(5,000)
Loan repayment
(wire transfer)
(58,000)
ABC
(58,000)
The following schedule sets out all the December 1975 Monitor Ranch transactions *71 as shown on the accountants' report: Operating Entities
Financing Entities
MRP
Margolis, et al.
Description
MLC
MRP
Ptrs.
NEP
Entity
Amount
12/2/75
Loan
$6,000 ABL
$6,000 12/22/75
Loan
4,300 ABL
4,300 12/26/75
Purchase of
cattle from MRP
68,000 $68,000 Loan repayment
(68,000)
ABL
( 68,000)
12/30/75
Cattle management
fee paid to MRP
185,110 185,110 Sale of
cattle to MRP
(62,697)
(62,697)
Zeiler-Partner's
cap contribution
4,000 $4,000
Loan
115,000 ABL
115,000 Loan repayment
(125,000)
ABL
(125,000)
12/31/75
Rent on lease of
Monitor Ranch
(112,500)
(112,500)
Loan
$100,000 ABL
100,000 Liquidating
distribution
of cash
(100,000)
ABC
(100,000)
The following schedule sets out all the December 20, 1976, Monitor Ranch transactions as shown on the accountants' report: Operating Entities
Financing Entities
Margolis, et al.
Description
MRP
NEP
Entity
Amount
Loan
$50,000 ABL
$50,000
Rent on lease of
Monitor Ranch
(50,000)
$ (50,000)
Correspondence *72 ensued between Mr. Dunnett, representing the Courtneys and Mr. Margolis, et al., and attorneys for the Utters with respect to the accountants' report and the arbitration proceedings in general. Hearings were held in the proceedings. An investigation was ordered by the arbitrator and accountants (not the same firm as the accountants who had prepared the report on behalf of Mr. Margolis and the Courtneys) were agreed upon to investigate the records of the Monitor Ranch. In a letter dated February 9, 1977, a representative of the accounting firm engaged to investigate the Monitor Ranch records reported to the arbitrator, in part, as follows: This letter is to confirm our understanding of the arrangements to be made in connection with the engagement of our firm to calculated the amounts of money due to each of the above parties from the ranch sale pursuant to paragraphs 10 and 11 of the agreement previously submitted to our office. Our accounting examination will involve a review of the financial relationships of the parties since the acquisition of the ranch in May, 1971 until the present time. It is not contemplated that we will make a detailed examination of all transactions. *73 However, our examination will include a review of the books and records including supporting invoices, tax returns and any other documents or agreements, which we feel necessary, under the circumstances, to determine the amount of money due to each of the parties from the sale of the ranch. It is understood that there are to be no limitations or restrictions imposed on us in the completion of this engagement. Our findings will be conveyed in a special report to be submitted, barring unforeseen circumstances, no later than March 15, 1977. It is further understood that representatives of our firm may be required to give expert testimony in the arbitration hearings which are scheduled March 21 and 22, 1977, in Reno, Nevada. All of the parties to the arbitration proceeding endorsed this letter under the statement: "The foregoing fully describes the services required and is in accordance with our understanding." The firm of accountants engaged to investigate the financial affairs in the Monitor Ranch arbitration filed a report entitled "Special Report / Arbitration Hearing / Monitor Ranch 1971-1976," with an effective date of May 18, 1977. In this report, reference was made to *74 the report prepared by accountants on behalf of the Courtneys, Mr. Margolis, and Mr. Margolis' related interests. The report of the accountants investigating for the arbitration proceeding had attached to it an exhibit which showed "Transfer by the Following Entities." This document showed-- Martin Trust
$200,000 Utter
(31,419)
Courtney
(28,031)
MRP partnership
169,000 NEP
227,913 Margolis, et al.
842,171 Total
$1,379,634 This special report contained the following with respect to a possible adjustment to Mr. Courtney's credit for cattle he had contributed to the ranch: The presentation on Exhibit A-2 contends excess credits were allowed Mr. Courtney for cattle transferred to the ranch. Credit allowed resulted in a cost of $127,762.00 for 518 animals. A memorandum dated November 22, 1971, page two, item number seven, states 412 animals were transferred; and if the unit costs in the memo are extended, indicates a total cost of $103,475.00. This results in an average cost per animal of approximately $250.00. Two other major purchases of livestock were made from outside parties in 1971, at a total cost of $78,000.00 for 360 animals. This *75 results in an average cost per animal of approximately $217.00. We do not know that the cattle purchased from the outside parties were comparable to those purchased from Mr. Courtney. We find one other memo discussing the Courtney cattle dated July 27, 1973. This memo, on page two, paragraph two, states, "It was agreed that Walt would receive credit on his accounting for $127,762.00 as the value of the cattle which he brought from Grass Valley to Monitor." There was also a comment in the report with respect to possible adjustment to cattle shortages on the May 28, 1971, ranch purchase. In the arbitration proceeding, such matters as Mr. Utter's Escrow No. 5508 in excess of $200,000 and the actual value of cattle contributed by Mr. Courtney were considered. On October 13, 1978, C. C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP, as sellers, accepted an offer from the Zimmerman family and Zimmerman Ranching Corp. to purchase for $1,600,000 the real property known as Monitor Ranch (with the exception of the 137 acres identified as the Northumberland property), Triple T Ranch and Blue Springs Ranch plus all improvements, *76 leases, AUM's or other Government grazing permits, water rights, equipment, vehicles and all other property belonging to the sellers as part of the ranch operation. The sellers also accepted the Zimmermans' offer to purchase all livestock on the Monitor, Triple T and Blue Springs ranches for $602,926, less the value of any cattle sold since a cattle count was completed in April and June of 1978, plus 10 percent of this net count valuation. The Zimmermans' purchase offer provided that 50 percent of all mineral rights and geothermal rights incident to the subject property would be retained by the sellers for 13 years, at the end of which time the rights would terminate if nothing had been done with the rights. The Zimmermans offered to pay the $1,600,000 purchase price for the ranches, with a downpayment of $480,000 and the $1,120,000 balance secured by a first deed of trust and payable in 10 annual installments on the anniversary date of the escrow closing. The Zimmermans' purchase offer provided that the purchase price of the livestock was to be paid in cash at the close of escrow. The Zimmermans acknowledged that the offer to purchase was made after reviewing the August 16, 1977, supplemental *77 agreement between the sellers. By a quitclaim deed dated December 26, 1978, Merrimac Corp. [4] quitclaimed to C. C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP the Monitor Ranch, Triple T and Blue Springs property and all attached rights, including all rights in grazing permits issued by the Secretary of the Interior or the Secretary of Agriculture of the United States. Excepted from the property description was the description of the portion of the Monitor Ranch known as the Northumberland property. The quitclaim deed was signed by Robert Dunnett as attorney in fact for Merrimac. *78 By a quitclaim deed dated December 26, 1978, C. C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP quitclaimed to C. C. Utter an undivided one-third interest, and to Seabright Land Corp. an undivided two-thirds interest, as tenants in common, in the Northumberland property and all attached rights. Robert Dunnett signed the quitclaim deed as attorney in fact for Mr. Margolis, NEP and MRP. The Seabright Land Corp. was a corporation formed by Mr. Margolis and Mr. Courtney. Mr. Margolis and Mr. Courtney owned the stock of Seabright Land Corp. By a quitclaim deed dated December 26, 1978, C. C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP quitclaimed to C. C. Utter an undivided one-third interest, and to Seabright Land Corp. an undivided tow-thirds interest, as tenants in common, to all their interest in minerals, oil and gas and geothermal steam on the Monitor, Triple T and Blue Springs ranches, excluding the Northumberland property, for a period of 13 years. Robert Dunnett signed this deed as attorney in fact for Mr. Margolis, NEP and MRP. By a deed dated December 26, 1978, C. *79 C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP, as grantors, granted, bargained and sold Blue Springs and Triple T ranches to 7-K Ranching Corp. Together with their interest in the real property the grantors transferred their interest in the grazing permits incidental to the real property, with the reservation for 13 years of 50 percent to the grantors of the mineral rights. By a deed dated December 26, 1978, C. C. Utter, Jane Utter, the Martin Trust, MLC, Walter A. Courtney, Carole Courtney, Harry Margolis, NEP and MRP, as grantors, granted, bargained and sold to Monitor Ranching Corp. the real property known as the Monitor Ranch, with the exception of the Northumberland property, together with the grazing rights attached thereto. This deed also provided for the reserved interest for 13 years in the mineral, oil and gas and geothermal steam rights. On December 29, 1978, Ruthe Smith of First Commercial Title, Inc., of Reno, Nevada, in connection with Escrow No. NL 37451-2/Monitor Livestock Co., forwarded to Mr. Dunnett a cashier's check in the amount of $647,898.08 to cover "CATTLE MONEY $446,874.84," and "PROCEEDS *80 $201,023.24." Hearings were held in connection with the arbitration proceeding, and under date of November 18, 1981, a final settlement was entered in the proceeding and the following day the San Francisco office of the American Arbitration Association closed its files on this arbitration. The final settlement provided as follows: This Settlement is entered into by and among all claimants (Walter A. Courtney, Carole Courtney, Harry Margolis, Nevada Enterprises Partnership and Monitor Ranch Partnership) and all respondents (C. C. Utter, Jane Utter, The Martin Trust and Monitor Livestock Company). This settlement refers to a Final Accounting among the parties relating to the Monitor Ranch Complex. The parcel known as North Umberland consisting of approximately 137 acres will continue to be owned one-third (1/3) by C. C. Utter and two-thirds (2/3) by Seabright Land Corporation. This joint ownership shall be the sole relationship remaining among the parties. Each of the parties hereto releases any and all claims against the other in consideration of this settlement. The parties agree that Forty Thousand Two Hundred Sixty-Six Dollars and Thirty-Three Cents ($40,266.33) shall *81 be added to respondents' total final participation which shall bring respondents' total to Four Hundred Ten Thousand Five Hundred Forty-Eight Dllars and Thirty-Three Cents ($410,548.33). There shall be added to claimants' total participation Fifty-Nine Thousand Eighty-Five Dollars and Forty-Five Cents ($59,085.45) bringing claimants' total participation to One Million Two Hundred Twenty-One Thousand Seven Hundred Thirty Dollars and Forty-Five Cents ($1,221,730.45). The total participation is One Million Six Hundred Thirty-Two Thousand Two Hundred Seventy-Eight Dollars and Seventy-Eight Cents ($1,632,278.78). Claimants' portion represents 74.85 percent of this amount. Respondent's portion represents 25.15 percent of this amount. On December 28, 1981, respondents shall receive Forty-Three Thousand Six Hundred Thirty-One Dollars and Six Cents ($43,631.06) and claimants shall receive One Hundred Twenty-Three Thousand Two Hundred Eighty-One Dollars and Ninety-Six Cents ($123,281.96) as a one-time single adjustment. Thereafter, each December 28, from 1982 through 1988, the purchasers of the Complex pay One Hundred Sixty-Six Thousand Nine Hundred Thirteen Dollars and Two Cents ($166,913.02). *82 Commencing on December 28, 1982, claimants shall receive One Hundred Twenty-Four Thousand Nine Hundred Thirty-Four Dollars and Forty Cents ($124,934.40) of said payment and respondents shall receive Forty-One Thousand Nine Hundred Seventy-Eight Dollars and Sixty-Two Cents ($41,978.62) of said payment. This settlement shall be executed by all parties and approved by the arbitrator. Thereafter, it shall be delivered to First Commercial Title Company, Reno, Nevada, to serve as joint instructions to that company to disburse the funds they receive each year in accordance with the settlement. This final settlement was signed by Walter A. Courtney; Carole Courtney; Harry Margolis; Nevada Enterprises Partnership by Linda E. Labash; Monitor Ranch Partnership by Linda E. Labash; C. C. Utter; Jane Utter; the Martin Trust by Fairy Utter; Monitor Livestock Co. by C. C. Utter; and was signed as so ordered by the arbitrator. There was an addendum to the agreement providing that each party might withdraw their exhibits. There had developed during the hearings in the arbitration proceeding the question of getting the title to the property composing the Monitor Ranch complex into a form in *83 which it could be transferred and the ranch sold, so that the proceeds might be divided. During the course of the proceeding, questions arose as to the ownership of the MLC stock. Mr. Dunnett testified in a hearing before the arbitrator on June 14, 1977, with respect to the stock of MLC. The Martin Trust was the holder of the MLC stock on March 20, 1972. In late July or early August 1976, Mr. Dunnett drafted a document entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock." This document reads in full as follows: This Agreement is entered into by and between two trustees on behalf of the beneficiaries represented by each. The trustees are more specifically identified in the recitals hereinafter set forth. RECITALS
A. On May 24, 1971, Mr. Jewel Martin established a trust which specifically designated Camille Chester Utter and his wife, Jane Utter, as beneficiaries. Fairy Utter, Martin Besso and John Arden were selected as trustees. Fairy Utter, as trustee of that trust, is one of the trustees referred to in the introductory sentences above and shall hereinafter be referred to as Trustee "A". Hereinafter, this trust, as represented *84 by Trustee Fairy Utter, shall be referred to as "The Martin Trust". There is marked Exhibit "A" attached hereto and incorporated by this reference as if fully set forth herein, a copy of that trust agreement. B. On May 24, 1971, Camille Chester Utter and his wife, Jane Utter, transferred to The Martin Trust their interest in an escrow participation in exchange for The Martin Trust's promise to pay each of them certain annuities for the remainder of their lives. A copy of that annuity agreement is marked Exhibit "B" attached hereto and incorporated by this reference as if fully set forth herein. C. On May 27, 1971, The Martin Trust transferred the interest it held in said escrow participation to Bonaire Development Company in exchange for an option to purchase the stock of a Nevada corporation (Monitor Livestock Company) and other valuable consideration. A copy of the agreement transferring said interest is marked Exhibit "C" attached hereto and incorporated by this reference as if fully set forth herein. D. On March 20, 1972, The Martin Trust purchased all of the outstanding stock of The Monitor Livestock Company. A copy of the "Agreement for Sale of Stock" is marked Exhibit *85 "D" attached hereto and incorporated by this reference as if fully set forth herein. E. On July 1, 1972, The Martin Trust entered into an agreement with Aruba Bonaire Curacao Trust Company Limited. Aruba Bonaire [Curacao] Trust Company Limited is the other trustee mentioned in the introductory sentences and will hereinafter be referred to as Trustee "B". Trustee B is a trust company organized and functioning solely as a trustee on behalf of the beneficiaries it represents. The beneficiaries represented by Trustee B and on whose behalf Trustee B is acting in entering into this agreement are all citizens of the United States of America. A copy of this agreement is marked Exhibit "E" attached hereto and incorporated by this reference as if fully set forth herein. NOW, THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, Trustees A and B hereby agree as follows: Trustee recognizes and acknowledges that,
1. Effective December 1, 1974, Trustee A assigns and sets over to Trustee B with full warranty of title, all of The Martin Trust's title and interest in and to all of the outstanding capital stock of Monitor *86 Livestock Company. This interest is represented by Stock Certificate No. 20 in the amount of 55,550 shares. Trustee A instructs the officers of Monitor Livestock Company to cancel said certificate and issue such new certificate or certificates as may be directed by Trustee B. 2. Trustee B agrees to pay One Million Five Hundred Thousand Dollars ($1,500,000) for the outstanding capital stock described in paragraph No. 1 above. Said amount shall be payable as follows: A. Trustee B shall forgive all payments due from The Martin Trust under that certain promissory note, a copy of which is attached to that certain agreement appended hereto as Exhibit "D". The remaining balance of such note is One Million Two Fifty-Eight Thousand, Eight Hundred Ninety-Five Dollars and Sixty-Two Cents ($1,258,895.62). B. Trustee B shall assume the obligations of The Martin Trust to Monitor Livestock Company. Said obligations total Two Hundred Forty-One Thousand, One Hundred Four Dollars and Thirty-Eight Cents ($241,104.38) and accrue at 8 percent. The assumption of these obligations is subject to the warranty of title given by The Martin Trust. Trustee A and Trustee B acknowledge that this *87 sum is correct and in doing so recognize the sum of Two Hundred Thirty-Two Thousand, Two Hundred Forty-Five Dollars and Seventy-Eight Cents ($232,245.78) used in the agreement attached hereto as Exhibit "E" was in error. 3. Trustee B acknowledges that it has verified the animal count and assets which are presently designated as being owned by Monitor Livestock Company, including the recently acquired Triple T and Blue Springs property. 4. Trustee A and Trustee B have discussed the obligations of The Martin Trust to Camille Chester Utter and Jane Utter. These obligations are more specifically set forth in the annuity agreement attached hereto as Exhibit "B". Trustee B agrees to assume all responsibility of The Martin Trust under such annuity agreement and agrees to hold The Martin Trust harmless for any liabilities that may arise under such agreement. 5. The parties have discussed the questionable collectibility of the escrow participation described in Recital Paragraph B above. The Martin Trust hereby assigns and sets over to Trustee B all of its right, title and interest in that escrow participation and Trustee B accepts such participation without any guarantee from The *88 Martin Trust that the participation shall ultimately be collectible. 6. Any notice to be given or document to be delivered by either party hereunder shall be delivered in person to the other party or may be deposited in the mail, duly certified or registered, with postage prepaid and addressed to the other party to whom intended, as follows: TRUSTEE A: c/o Fairy Utter, P.O. Box 337, Reno, Nevada 89504. TRUSTEE B: c/o Robert L. Dunnett, P.O. Box 549, Los Gatos, Ca. 95030. Shortly after drafting the document, Mr. Dunnett obtained the signature of Albert L. Colloms as president of ABC on the document. Mr. Dunnett drafted this document because he had been told by Mr. Margolis that some form of oral understanding was reached in December of 1974 with respect to the transfer of the MLC stock to ABC. At that time and through 1975, Mr. Dunnett was not the lawyer in Mr. Margolis' office responsible for the Martin Trust and Monitor Ranch operations. Mr. Dunnett, after obtaining Mr. Colloms' signature on the document entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock," attempted to obtain the signature of Fairy Utter as trustee of the Martin *89 Trust. He attempted by correspondence, telephone calls and personal meetings to obtain her signature. Fairy Utter refused to sign the document, telling Mr. Dunnett that she did not believe the MLC capital stock was transferred and she did not believe that MLC had been dissolved. She never signed the document entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock." At about the same time that Mr. Dunnett drafted the agreement entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock," he also drafted a document entitled "Settlement Agreement." This document states in part as follows: There is marked Exhibit A, attached hereto and incorporated by the reference as if fully set forth herein, a document entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock". The parties to that agreement are two trustees who are for convenience referred to as Trustee A and Trustee B and are specifically identified in that agreement. The parties to this agreement are the same two trustees and will be identified in the same manner. RECITALS: A. Trustee A--Martin Trust and Trustee B--ABC have engaged *90 in several transactions and entered into various relationships, each of which was undertaken on behalf of the beneficiaries they represent and each of which concerned certain ranching property located in Lander and Nye County, Nevada, known generally as the Monitor Ranch properties, including the Triple T and Blue Springs properties; and B. The trustees have not always been in accord as to the activities undertaken; however, this agreement is intended to resolve these prior differences and establish a procedure for terminating the relationship between the trustees. NOW, THEREFORE, in consideration of the mutual promises contained herein and for other valuable consideration, the parties agree as follows: 1. The interests represented by Trustee A and Trustee B (all of whom have executed this agreement to indicate their approval) have agreed that the major portion of the collective ranch properties should be sold. Those portions to be retained are more specifically described in paragraph 4 hereof. 2. As to that portion of the properties to be sold, the parties have agreed that such property should be placed in a single corporation whose ownership is held to the satisfaction *91 of both trustees. Trustee B has arranged for the incorporation of a Nevada company named Merimac [sic] Corporation. The parties agree that one-third of the total authorized capital stock of Merrimac (total authorized, 2,500 shares) shall be issued to Trustee A. This shall be accomplished by proper execution and delivery of share certificate No. 1 in the amount of 833 1/3 shares to Trustee A at the first meeting of the board of directors. The remaining 1,666 2/3 shares shall be issued as directed by Trustee B. 3. A portion of the relationships established between Trustees A and B involve a certain escrow participation which is fully described in attached Exhibit A. Both trustees and the interests they represent recognize and acknowledge that the collection of any proceeds from any escrow depends entirely upon the escrow holder's success in achieving payment of a certain promissory note which is the sole asset and source of funds of the escrow. The promissory note is secured by a mortgage which has been the subject of foreclosure proceedings. The collectibility of the promissory note remains questionable and uncertain and each of the trustees to this agreement, as well as *92 their representative interests, acknowledges this fact and enters into this agreement fully apprised of the situation. While each will act honorably and responsibly regarding the collection of the promissory note, each holds the other harmless from any injury, claim or liability resulting from the non-collection of the note. In full recognition of the above, Trustee B hereby delivers, assigns and sets over to Trustee A a portion of such escrow participation; that portion being all of those funds received after collection of the first $200,000 due and collected. Each trustee agrees to execute whatever documents are necessary to accomplish this partial transfer to Trustee A. 4. There are certain special rights and a certain special portion of real property which the trustees and their represented interests do not wish to sell. These include all mineral, natural gas and geothermal rights in approximately 137 acres, more or less, or real property generally known as North Umberland. Trustee B hereby delivers, assigns and sets over to Trustee A one-third of all its right in the above-described mineral, natural gas and geothermal rights, as well as one-third of its interest in the *93 137 acres. The parties agree to cooperate in executing those documents necessary to achieve this result. 5. There is an annuity agreement between The Martin Trust (represented by Trustee A) and Camille Chester Utter and Jane Utter, which is more specifically described in attached Exhibit A. Trustee A, in consideration of the capital stock, property, mineral, natural gas, geothermal and escrow participation rights granted to The Martin Trust herein, hereby assumes on behalf of The Martin Trust all responsibility and obligation to Camille Chester Utter and Jane Utter under such annuity agreement. Further, The Martin Trust shall hold Trustee B harmless from any liabilities or claims that may arise under such agreement. 6. This agreement is intended to settle any and all claims and disputes between the trustees and their represented interests and [sic] party hereby releases and discharges the other from any and all such claims. Mr. Dunnett obtained the signature of Trust B by Albert L. Colloms, president of ABC, on this document but did not obtain the signature of Fairy Utter, who was listed to sign as trustee of the Martin Trust, or any of the other intended signators. *94 When he attempted to obtain the signature of Fairy Utter in August 1976 to this document, her response was that she would not sign it and her final response was that she would follow the advice of her attorney. Fairy Utter never signed the document. Under date of September 3, 1975, a Certificate of Dissolution reciting that Monitor Livestock Co., a corporation organized under the laws of Nevada, "did, on the 3rd day of September, 1975, file in the office of Secretary of State a Certificate of Dissolution dissolving said corporation," was issued by the Secretary of State of the State of Nevada. Mr. Dunnett did not know who obtained Mr. Utter's signature on the Certificate of Dissolution, but he thought Mr. Margolis did. In a memorandum to Mr. Harry Margolis dated June 24, 1977, Mr. Robert Dunnett stated the following: I have delivered to Carole and Walt, Monitor Livestock Company Share Certificate No. 23 in the amount of 55,550 shares. It is the certificate that should be issued to ABC Trust Company. It requires your signature and Walt's signature plus affixing the seal. I believe it should be executed and delivered to Colloms and a copy kept for next week. I believe this *95 should be done even though ultimate testimony will show that it was executed today. I have given Walt one of the seals for Monitor Livestock Company and if you agree, I would appreciate your seeing that the certificate is executed and the seal affixed. The MLC stock certificate attached to Mr. Dunnett's June 24, 1977, memorandum has no corporate seal and is not executed. The certificate provided for the signatures of Walter A. Courtney, as secretary, and Harry Margolis, as vice president. The date on the certificate, shown as the date of execution, is December 1, 1974. The certificate states: "This certifies that Aruba Bonaire Curacao Trust Co., Ltd., is the owner of 55,550 Shares of the Capital Stock of Monitor Livestock Company." In a letter to Robert Dunnett, a lawyer representing the Utter interests referred to his review of the documentation of the various transfers of stock of MLC and the fact that his conclusion from this documentation was that the Martin Trust had not made a transfer of MLC stock and that it would appear to him that the purported dissolution of MLC was without legal effect because the designated shareholder therein, ABC, was not the shareholder of *96 record, and the Martin Trust did not consent to the dissolution. In this letter, the lawyer made several suggestions to Mr. Dunnett for a method of clearing title to the Monitor Ranch property to facilitate a sale. A document entitled "Financing Agreement," dated December 17, 1974, is signed on behalf of NEP, as borrower, by Robert Dunnett and on behalf of World Entertainers, Ltd. (WE) by Lee Bing Chuen, director. WE was a Bahamian corporation that had been formed in 1961 for the benefit of two trusts for clients of Mr. Margolis. In 1974, WE was managed by Peter Wang in Hong Kong and by a company called Upland which did management for ABC. The document entitled "Financing Agreement" stated in part that NEP "wishes to obtain financing in order to purchase certain grazing and range land located in the central portion of the State of Nevada and generally comprised of Monitor Ranch, Triple T Ranch, and Blue Springs Ranch, from CRC Services, Inc., a California corporation." The agreement stated that WE agreed to loan NEP $2 million for 19 years at an effective annual interest rate of 4 percent. It provided for payment of interest only for a period of time and later repayment of principal *97 and interest. The agreement further recited that since the terms were highly advantageous to NEP, and "in light of the cost of long-term financing in today's market" as additional consideration, that before the end of 1974 NEP was to deposit $3,500,000 with WE "for one year." The deposit was to be unsecured and interest-free. WE's obligation to provide $2 million to NEP would arise upon receipt of the $3,500,000 deposit from NEP. Paragraphs 4, 5 and 6 of the "Financing Agreement" recite as follows: 4. The source of payments to be made by Borrower to WE will be the rental of the Nevada grazing and range land to be purchased by Borrower, and Borrower agrees to apply all such rental to the repayment of the obligation to be incurred hereunder and to no other purpose. 5. It is recognized that in order for Borrower to maximize the tax benefits available to its partners under current United States tax law, there must be no personal liability on the part of any partner for the loan made by WE to Borrower hereunder. Therefore, WE agrees that there shall be no personal liability on the part of any partner of the general partnership, and WE expressly acknowledges that such exclusion *98 of personal liability is a prime condition of this Agreement. 6. In return for such exclusion of personal liability, Borrower agrees that WE, or its assignee, shall be entitled on default in any payment due hereunder to require the assignment of the outstanding lease in order to insure that the rentals shall be applied solely to the balances due hereunder. WE, or its assignee, shall be entitled to recover judgment against Borrower pursuant to which the lease will be assigned to WE, or its assignee, and Borrower hereby authorizes any attorney in the State of California to enter judgment for this purpose after thirty (30) days notice has been given of any default. Under date of December 19, 1974, a document stating that it was an agreement of sale by ABC of the Monitor Ranch property to Kizt Partnership was signed, and also under this same date a document was signed on behalf of Kizt Partnership transferring its rights to this option to purchase to Convalescent Rehabilitation Center Service, Inc., a California corporation (CRC). Both of these entities were handled in the law offices of Mr. Harry Margolis. Under date of December 19, 1974, a document entitled "Agreement of Sale *99 and Assignment of Lease" was signed by Mr. Dunnett on behalf of NEP and was also signed on behalf of CRC. This document stated that it transferred the various Monitor Ranch properties, the lease to MRP, and the cattle on the property from CRC to NEP. The 1974 general ledger of NEP shows under entry date of December 19, 1974, a receipt by NEP in the total amount of $3,850,000 from ABL, the entries being in the following amounts: $1,000,000 1,000,000 1,000,000 350,000 500,000 The same amounts are reflected among the December 20, 1974, entries on NEP's Barclays Bank account. Four advices of charges to NEP from Barclays Bank dated November 20, 1974, state that $3,500,100 had been charged against NEP's account to reflect telephonic transfers "to Curacao, favour World Entertainers Ltd." and bank charges of $25 for each transfer. The charges were in the amounts of-- $1,000,025 1,000,025 1,000,025 500,025 On December 20, 1974, NEP received two credit advices from Barclays Bank of California, each indicating that $1 million had been deposited to NEP's account pursuant to a telephonic transfer from Banco Popular Antiliano by order of WE. On December 19, 1974, NEP *100 issued two checks signed by Mr. Reiserer of Mr. Margolis' office, payable to CRC, each in the amount of $1 million. These checks cleared NEP's Barclays Bank account on December 20, 1974. Two million dollars was entered in NEP's general ledger under Account No. 120, "Account of Purchase." Journal entry No. 6 reclassified this entry to the following accounts: Cattle
Account No. 122
$700,000
Land
Account No. 121
300,000
Lease
Account No. 125
1,000,000
NEP's cash receipts journal shows under date of December 19, 1974, receipts from "Harry Margolis, Trustee" in the total amount of $350,000. Deposits in the amounts of $250,000 and $100,000 were made to NEP's Barclays Bank account on December 20, 1974. NEP's general ledger credited these payments to Account No. 503, "Loan Payable--H. M. Trustee on behalf of ABC." By two checks to Antigua Banking Ltd. (ABL) drawn on NEP's Barclays Bank account dated December 19, 1974, and signed by Mr. Reiserer, $350,000 was transferred from NEP to ABL. ABL was a private bank managed and operated by Mr. Margolis primarily to furnish financing to his clients. The two checks, in the amounts of $250,000 and $100,000, cleared *101 NEP's account on December 20, 1974. The December 19, 1974, $250,000 and $100,000 checks to ABL are recorded in NEP's general ledger as part of the $370,000 entry under Account No. 131 "Loan Receivable--Antigua Banking, Ltd." The cash receipts journal of NEP reflects the receipt of $350,000 from ABL on December 19, 1974; a deposit in this amount was made to NEP's Barclays Bank account on December 20, 1974. The $350,000 shown as received by NEP from ABL on December 19, 1974, was recorded in NEP's general ledger as $350,000 advance credit under Account No. 131 "Loan Receivable--Antigua Banking, Ltd." By check to ABL on NEP's Barclays Bank account, dated December 19, 1974, and signed by Harry Margolis, $350,000 was transferred to ABL. This check cleared NEP's account on December 20, 1974, and was recorded in NEP's general ledger under Account No. 889 "Interest Expense." A document entitled "Promissory Note" signed by Robert L. Dunnett, partner" recites in part as follows: Nevada Enterprises Partnership DATE 12-19-74 NOTE NO. 965 AMOUNT $3,500,000.00 TERM On Demand FOR VALUE RECEIVED, I/We promise to pay to ANTIGUA BANKING LIMITED on order, at Saratoga, California, the *102 sum of Three Million Five Hundred Thousand Dollars ($3,500,000.00) together with interest at the rate of Ten percent (10%) per annum from the date above shown on all unpaid principal balance until paid, principal and interest payable as follows: * * * X Other: Terms: Interest payable one year in advance, principal upon demand but if no demand in 1 year Due Date:      . The document shows the "Promissory Note" as unsecured. ABL transferred this note to Barclays Bank International, Tortola, British Virgin Islands, with the following endorsement: For value received Antigua Banking Limited hereby assigns, transfers, conveys, and sets over to Barclays Bank International, Tortola, British Virgin Islands the within promissory note without warranty. This assignment is effective the 19th of December, 1974. Dated: February 12, 1975 ANTIGUA BANKING LIMITED By Harry Margolis, President Barclays Bank International, Tortola, British Virgin Islands, transferred $3,500,000 to ABL. The 1974 NEP cash receipts journal reflects the receipt of a total of $240,000 in capital contributions on the following dates and in the following amounts: Date
Received from
Amount
12/18
Vern Walton
$20,000
12/24
LaFargue Trust
120,000
12/26
William Berman
10,000
12/26
Leo Branton
10,000
12/26
Kenneth Reiserer
10,000
12/26
Robert Dunnett
10,000
12/26
Seymour DeMatoff
30,000
12/30
Charles Johnson
10,000
12/28
Walter Kearns
20,000
*103 Checks from NEP's Barclays Bank account signed by Mr. Reiserer and payable to Harry Margolis, Trustee, bear the following dates and amounts: Date
Amount
12/24
$120,000
12/26
10,000
12/26
10,000
12/26
10,000
12/26
30,000
12/30
10,000
12/30
20,000
The 1974 NEP ledger shows NEP December checks to Harry Margolis, Trustee, as a $220,000 entry under account No. 503 "Loan Payable--HM Trustee on behalf of ABC." Mr. Margolis, as president of ABL, on December 19, 1974, executed a promissory note to NEP in the amount of $20,000. Mr. Reiserer signed a December 19, 1974, check from NEP to ABL in the amount of $20,000. This disbursement is reflected as of December 18 in NEP's cash disbursement journal and appears in the general ledger as part of a $370,000 entry under Account No. 131 "Loan Receivable--Antigua Banking Ltd." Under date of December 31, 1974, a promissory note of NEP signed by Mr. Reiserer in the amount of $250,000 is shown as payable to Anglo Dutch Corp. (ADC). On December 31, 1974, a check signed by Mr. Reiserer for NEP to MRP was drawn in the amount of $250,000. This disbursement was reclassified on NEP's general ledger from Account No. *104 120 "Account of Purchase" to Account No. 122 "Cattle." Journal Entry No. 7 states: "To reclassify purchase from Monitor Ranch Partnership 12-30-74 (cattle--1,023 1975 calf crop, 826 yearlings (1-2 years) and 293 2-3 yrs. old)." ADC was a private bank operated by Mr. Margolis in the same manner as ABL. ADC was in operation prior to the formation of ABL. It was owned by Mr. Margolis from about 1970 and personally served his clients. In this respect ADC was a predecessor of ABL. ADC was liquidated in 1976 or 1977. A credit advice from Barclays Bank of California dated July 24, 1975, showed that $78,958.30 had been deposited to NEP's account "Per our International Division, to credit your account by order of Premier Cup Co." NEP's 1975 general ledger records $75,000 of this amount under Account No. 142 "Note Receivable--Premier Cup Co., Inc." Journal Entry No. 2 in NEP's 1974 journal shows this note receivable as "capital contribution", Premier Cup 1974. The remaining $3,958.30 is recorded on NEP's 1975 general ledger under Account No. 602 "Interest Income." Under date of July 23, 1975, a check to Harry Margolis, Trustee, is drawn on behalf of NEP in the amount of $75,000. This *105 check cleared NEP's Barclays Bank account on July 24, 1975. On NEP's 1975 general ledger this check is recorded under Account No. 503 "Loan Payable--HM Trustee on behalf of ABC." NEP's October 31, 1975, statement from Barclays Bank shows a $40,000 deposit made on October 23, 1975. On NEP's cash receipts journal this amount is reported as "Monitor Ranch Part.-- Rent for 8/1/75 to 11/30/75." An advice of charge to NEP from Barclays Bank dated October 28, 1975, shows that $37,648 was charged against NEP's account for "Telephonic transfer today's date to BBI Ltd., Tortola for Credit Account Hexagram (Curacao) N.V. for US $37,623.00 plus our charges $25.00." A credit advice from Barclays Bank of California dated October 30, 1975, shows that NEP's account was credited with $100,000 per "Cable transfer today's date from BBI Ltd. New York for Credit your Account Upland Investments Ltd., instr. Manufacturers Hanover Trust Co. New York." This amount is recorded on NEP's general ledger as "Upland Inv. Ltd. Rent from 12/1/74 to 7/31/75 for ABC Trust Co. Ltd," Account No. 603 "Rent Income." A check dated October 30, 1975, made out to Harry Margolis, Trustee, in the amount of $55,000, was drawn *106 on NEP's account. The amount was recorded on NEP's general ledger as "Payment in Full--10/30/75" under Account No. 503 "Loan Payable--HM Trustee on behalf of ABC." A check dated October 30, 1975, on NEP's account, drawn to the order of ABL in the amount of $25,779 was recorded on NEP's general ledger as $25,000 of principal and $779 of interest under ledger Account No. 501. A check dated October 30, 1975, drawn by NEP to ADC for $25,000 is indicated as "interest only." On October 30, 1975, $100,000 was cabletransferred to NEP from ADC. A promissory note No. 1673 dated December 26, 1975, was signed on behalf of NEP showing an indebtedness of $65,000 to ABL. NEP's cash receipts journal for 1975 shows a December 22, 1975, receipt of $3,500 listed as a "capital contribution" from Vern Walton. A check dated December 26, 1975, signed on behalf of NEP, is payable to MRP in the amount of $68,000. Under date of December 30, 1975, NEP signed a note payable to ABL in the amount of $132,000. A check dated December 30, 1975, drawn by NEP payable to MRP in the amount of $122,413 is shown on NEP's cash disbursement journal as "MRP Management Fees--Cattle Sale Proceeds." The 1975 NEP cash *107 receipts journal reflects a December 30, 1975, entry of $112,500 entitled "Monitor Ranch Partnership (Prepayment of rent to August 1976)." On December 30, 1975, NEP drew a check for $110,000 made to ADC. On NEP's general ledger this check is recorded under Account No. 504 "Loan Payable--Anglo Dutch Capital Co." as "Payment principal only." The NEP 1977 cash receipts journal reflects a December 28, 1977, receipt of $150,000 from MRP. This entry is under Account No. 603 "Rental Income" in NEP's 1977 general ledger. An advice of charge from Barclay's Bank dated December 28, 1977, notified NEP that its account had been charged $150,025 for "Transfer to Tortola Favour Hexagram (Curacao) Limited for $150,000.00 plus our charges of $25,00." On NEP's general ledger this amount is shown under Account No. 889 "Interest Expense." Under date of May 13, 1977, a memorandum from Mickey McGinnis of Mr. Margolis' office to Jean Saenz, also of that office, regarding NEP states: There are six (6) notes outstanding with ABL that should be either cleaned up or renewed. See the attached print-out. I realize that NEP should be liquidating into Merrimac in 1977 and that this has a bearing on the *108 notes. I would appreciate you and Bob reviewing this matter and giving me a decision on how the note renewal or clean up should be handled. The ABL statement of account for NEP notes receivable shows ending principal balances on May 31, 1977, and July 31, 1977, of $324,000. Promissory note No. 2734 to ABL from NEP, signed by R. H. Adolphson, V.P., Froom Corp., is dated August 15, 1977. This note is in the amount of $358,440 and shows that it canceled and replaced NEP's promissory notes to ABL numbered 1642, 1673, 1677, 1683, 1700, 1885 and 2060. The balance of note No. 2734 was shown as applied to "interest." NEP promissory note No. 2734 was canceled and replaced on August 15, 1978, by promissory note No. 3514 from NEP to ABL in the amount of $358,440. This note was signed on behalf of NEP by Michael Chatzky. The ABL statement of account for NEP notes receivable shows that on December 31, 1977, there was an ending balance of $383,440 principal and $13,449 interest. The ABL statement of account for NEP notes receivable shows on December 20, 1978, payments in the total amount of $167,442 and $154,000 principal and $13,442 interest, with a December 31, 1978, ending balance of *109 $229,440 principal and $37,922 interest. The ABL statement of account for NEP notes receivable shows on January 2, 1979, payments in the total amount of $267,490 and $229,440 principal and $38,050 interest, with a zero ending balance of principal and $2 ending balance of interest. The source of Mr. Dunnett's and Mr. Reiserer's capital contributions to NEP were loans from ADC. When Mr. Reiserer "sold" his NEP partnership interest for $11,800, he used $11,400 or $11,500 of the proceeds to repay ADC. Mr. Reiserer relied on Mr. Margolis to set the price for the "sale" of his NEP partnership interest. A letter to Misat Corp. dated April 14, 1978, from Froom enclosed an April 13, 1978, $44,333 check from Froom to Misat. Attached to this letter is an April 13, 1978, $44,333 check from Misat to ABL.The following schedule shows information regarding NEP with respect to "partners, partnership interest, and capital contributions," showing the "purchase price" and "purchaser": NEP
Capital
Partner
Contribution
Date of Sale
Sale Price
Purchaser
Berman
$ 10,000
1/1/78
$13,000 (net)
Froom
Branton
10,000
12/31/75
11,000
NEP
DeMatoff
30,000
1/1/78
Dunnett
10,000
12/31/75
11,000
NEP
Froom
100,000
Johnson
10,000
12/31/75
11,000
NEP
Kearns
20,000
12/31/76
60,000
NEP
(30,000 cash, 30,000
cancel. neg. cap. acct.)
LaFargue
20,000
12/31/77
63,000
NEP
Trust
(25,000 cash, 38,000
cancel. neg. cap. acct.)
Misat
35,000
1/1/78
44,333
Froom
(4/3/78 pmt)
Premier Cup
75,000
12/26/75
82,500
NEP
Reiserer
10,000
6/30/76
11,800
NEP
(pmt due 7/30/76)
Walton
23,500
1/1/78
30,607 (net)
Froom
*110 In their income tax returns for each of the years here involved, each petitioner claimed a loss from that petitioner's distributive share of losses reported by NEP on its return of partnership income. Respondent in his notice of deficiency to each petitioner disallowed these claimed losses from NEP, stating that there was no distributive loss to petitioner from NEP since it had not been established that a partnership in fact existed, that the partnership in fact sustained a loss, that any loss if sustained should be recognized as bona fids for tax purposes, that the partnership was the equitable or beneficial owner of the property, and that the amounts claimed represented ordinary and necessary business expenses. In the alternative, it was stated that respondent determined that if a partnership did in fact exist, the amounts claimed as partnership expenses are disallowed because it has not been established that an indebtedness was incurred, that the amounts claimed as expenses were paid or properly accruable, that the transaction giving rise to the expenses should be recognized for tax purposes, and that the amount claimed represented ordinary and necessary business expenses. *111 With respect to the claimed investment tax credit of each partner, respondent stated in the notice of deficiency that it was determined that the amount claimed as qualified investment property is disallowed because it has not been established that NEP was the eguitable or beneficial owner of the property, that the basis claimed for the property should be recognized as bona fide for tax purposes and that the amount claimed was for qualified section 38 property as defined in the 1954 Internal Revenue Code. Respondent on brief states that if he is sustained in his position that none of petitioners are entitled to the loss deductions claimed with respect to alleged losses of NEP, then in the years that gains were reported from dispositions of interests in NEP, the respective petitioners' income should be appropriately adjusted. OPINION Respondent's primary contention is that NEP was a sham that should not be recognized for Federal tax purposes. Respondent argues that no business purpose was served by NEP, but that NEP was used solely as a method of obtaining tax deductions for the various partners who were clients of Mr. Margolis without any substantive transactions taking place. *112 Respondent argues in the alternative that even in form NEP did not purchase the assets of the Monitor Ranch because the stock of MLC was never transferred by the Martin Trust to ABC; therefore, there was no proper dissolution of MLC and the various documents signed by various parties with ABC were a nullity. Respondent argues with respect to the claimed interest deduction that in fact the indebtedness on which the claimed interest deductions were based did not exist and that no interest payments were made, but money was merely circularized through various entities controlled by Mr. Margolis. This record is clear that in form the stock of MLC was transferred by IAL to the Martin Trust and no one on behalf of the Martin Trust ever signed a document selling or agreeing to sell or transfer the MLC stock to any other entity prior to the time of the arbitration proceeding. A document was drafted in 1976 reciting that the MLC stock had been transferred by the Martin Trust to ABC in December 1974, but fairy Utter would not sign the document. There is no precise testimony in the record that there ever was an oral agreement for the transfer of the MLC stock by the Martin Trust to ABC. Mr. *113 Dunnett in effect testified that Mr. Margolis told him there was an oral agreement and therefore in preparation for the arbitration proceeding in 1976 he drafted a document to be effective as of December 31, 1974, stating that the stock was transferred by the Martin Trust to ABC. Mr. Dunnett testified that Fairy Utter, as trustee of the Martin Trust, refused to sign the document, and it was never signed. Mr. Margolis testified at length about the various transfers of the MLC stock but never specifically stated that there did exist in form an oral agreement between Fairy Utter and a representative of ABC for the stock to be transferred by the Martin Trust to ABC. Mr. Margolis testified that the document drafted in 1976 "was signed," but the record clearly shows it was signed only on behalf of ABC, and Fairy Utter refused to sign it on behalf of the Martin Trust. [5] On this record we conclude that in form the MLC stock was not transferred by the Martin Trust to ABC and therefore the transfer in form made by ABC to other entities could have no significance. At the time of the drafting of papers dissolving MLC and transferring the assets through various entities to NEP, ABC did not *114 in form own the stock of MLC and could not dissolve it and take its assets. Therefore, even in form NEP did not acquire the Monitor Ranch assets. *115 We likewise consider it clear from this record that in fact no $350,000 was paid by NEP as interest to ABL in the latter part of 1974. In our findings, we have set forth in some detail the circularization of $3,500,000 of funds. In substance, we conclude that NEP did not supply $3,500,000 to WE and did not borrow $3,500,000 from ABL to make a deposit of that amount with WE. In substance NEP did not incur an interest obligation to ABL for $350,000 nor pay interest in that amount to ABL. The transactions are very complicated, but there is clearly no substance to the various transfers of money. The records are made to show that $3,500,000 was transferred from ABL to NEP, and from NEP to WE. NEP signed a note to ABL for $3,500,000 and ABL, without recourse, transferred that note to Barclays Bank, Tortola and received $3,500,000 from that bank. Although the Barclays Bank, Tortola records are not in evidence in this case, the inference is clear that the $3,500,000 traveled a circle from WE to ABL to NEP to WE to ABL. It would tax our credulity too far to believe that Barclays Bank, Tortola used its own funds to purchase a $3,500,000 note signed by an unknown newly formed "partnership" *116 without recourse on the endorser. We conclude that in substance NEP did not borrow $3,500,000 from ABL and did not in substance pay ABL $350,000 interest in 1974. The record shows that the purported interest payment of $350,000 by NEP to ABL was made from the proceeds of a "loan" from ABL to NEP. In other words, ABL transferred funds to NEP and NEP returned the funds to ABL. In our view, no advance of $3,500,000 to WE is shown by this record to have been made by NEP, and no loan from ABL to NEP was in substance made. In substance there was no interest payment of $350,000 by NEP to ABL. The situation here is quite comparable to that in Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982), in which we refused to recognize a circular movement of funds as in substance creating a debtor-creditor relationship. Our conclusion that NEP even in form did not purchase the assets of the Monitor Ranch, and that no interest payment of $350,000 was in substance made in 1974 by NEP to ABL, disposes of some of the claimed deductions by NEP in the years here in issue. However, there are certain other transactions shown in the records *117 of NEP which it is claimed give rise to certain claimed deductions; therefore, it is necessary to consider whether any of the transactions were substantive transactions giving rise to the deductions claimed. The interest deductions claimed in 1975 and 1976 are due primarily to a claimed payment of interest on a purported $2 million loan to NEP from WE, the proceeds of which NEP purportedly transferred to CRC in payment for the Monitor Ranch properties and the assignment of the MRP lease. The record shows transfers of $2 million to NEP's bank account stated to be by WE. The record also shows the transfer of $2 million by NEP to CRC. Although not documented, CRC, according to the form of the papers, was to transfer the $2 million to Kizt, which was to transfer it to ABC. The record does not show, even in form, the disposition ABC was to make of the $2 million. However, the record does show that the NEP "partners" were not personally liable for the WE "loan," and WE's only purported security was the payment of "rent" by MRP for the lease which the record shows was not even in form assigned to NEP since after the transfer of the MLC stock to the Martin Trust, Fairy Utter refused *118 to sign the document acknowledging a "sale" of this stock to ABC. Certainly, if in substance WE had loaned $2 million to NEP, someone on behalf of WE would have required proof that NEP did own the lease, the payments under which were to be its sole source of repayment of the $2 million and the interest thereon. Therefore, even though, because of the absence from the record of foreign documents, the exact final disposition of the $2 million does not show, we conclude that the weight of the evidence is that in substance there was no $2 million loan by WE to NEP. The other deductions claimed are with respect to depreciation of cattle, an investment tax credit partially related to the cattle and a small bank charge expense. The record shows that in the various accountings considered by the arbitrator in the arbitration proceeding with respect to the Monitor Ranch complex, NEP is shown as having made payments of $227,913 toward the financing of the Monitor Ranch. In the final settlement of the arbitration proceeding, this $227,913 was considered as funds advanced by the Margolis group, making up the approximate 75 percent of the proceeds from the sale of the Monitor Ranch complex *119 which was to go to the Margolis group. The record shows that any sum credited in the arbitration proceeding as being financed by NEP came to NEP from either ADC or ABL, both of which were financing entities controlled by Mr. Margolis. In fact, when asked by the Court about the $227,913 shown in the arbitration proceeding as coming from NEP, Mr. Margolis replied that NEP "didn't get any of that." He stated that "they had to * * * pay it back to Anglo Dutch and ABL." On this record, it appears that most of the stated partners in NEP put no funds into the partnership aside from funds supplied or "borrowed" from ABL or ADC. Most if not all of the funds passing through the books and records of NEP originated with ABL or ADC, the primary source being ABL. Petitioners argue that ABL made legitimate loans to NEP and "partners" of NEP, and the fact that all funds of NEP came from loans does not cause the transactions in which NEP engaged to lack in substance. Certainly, many substantive transactions are financed with borrowed funds. However, in such instances the borrower actually has an obligation to repay those borrowed funds. Also, in a substantive transaction the borrowed funds *120 are used for the benefit of the borrower. This record shows no substantive reason for the existence of NEP. The explanation for its formation given by Mr. Margolis was that NEP was to furnish financing for the Monitor Ranch complex. However, this record shows that any funds "supplied" by NEP to the Monitor Ranch in fact came from ABL or ADC. There is no showing that NEP furnished any independent financing to the Monitor Ranch complex. Since the financing was in fact supplied by ABL or ADC, no substantive reason appears for the funds on the records passing through NEP. The evidence here shows that initially it was understood that the Courtneys and the Utters would own the Monitor Ranch complex and would be assisted in financing it by Mr. Margolis, and later the agreement changed so that the Utters, the Courtneys and Mr. Margolis would own the Monitor Ranch complex one-third each. This agreement was carried through into the arbitration proceeding, which was based on the ownership of the ranch by Mr. Utter, Mr. Courtney and Mr. Margolis adjusted for moneys put into the ranch by or on behalf of each owner. The 1/3--1/3--1/3 agreement is also confirmed by the method by which Mr. *121 Utter, Mr. Courtney and Mr. Margolis chose to own the Northumberland property which was not disposed of when the balance of the ranch was sold. The arbitration proceeding was an attempt to adjust for the funds that had been advanced by the parties in interest and thereby to come to a percentage to go to the Utters, the Courtneys and Mr. Margolis when the ranch properties were sold. Since the record shows that the Monitor Ranch complex was owned by the Utters, the Courtneys and Mr. Margolis, it is difficult to understand the reasons for the numerous documents which were drawn up purporting to make various transfers on paper of the stock of MLC, the corporation that held the Monitor assets. No reason appears on this record for the formation of NEP other than for the purpose of obtaining tax benefits for Mr. Margolis' clients. What was actually happening with the ranch property seems divorced from the numerous paper transfers made of the MLC stock through various entities controlled by Mr. Margolis. As Mr. Margolis himself testified, the arbitrator in the arbitration proceeding ignored all of these transfers "as if it never happened." As Mr. Margolis further explained in his testimony, *122 all of the various entities, aside from the Utters and the Courtneys, were treated as if they were "Harry Margolis'." Part of the reason, according to Mr. Margolis' explanation, was because of the relationship between these entities and ABC or, as Mr. Margolis said, the "Margolis ABC Trust." Also, in the arbitration proceeding, at no time was there an indication that NEP owned any cattle as distinguished from having made a financial advance to the Monitor Ranch complex. The record shows that the $250,000 transferred by NEP to MRP was money that came from ADC. The record shows that on December 31, 1974, there was a transfer to NEP of $250,000 from ADC and on this same day a $250,000 transfer from NEP to MRP in connection with a cattle purchase. On December 30, 1974, MRP transferred $102,000 to ABL, designated as a "loan repayment." In three transactions on December 30, 1974, MRP transferred a total of $147,901 to MLC and on December 30, 1974, MLC transferred $145,000 to Bel Haven, designated as a "capital contribution." As a result of these various transfers, all on December 30, 1974, $250,000 came to NEP from ADC and on that same day $247,000 was returned by NEP to ADC, ABL and *123 Bel Haven via MRP and MLC. It is not clear from the record the exact relationship of Bel Haven to Mr. Margolis or the other entities managed and controlled by him. However, in the arbitration proceeding the overall investment of the financing entities was reduced by the $145,000 transferred from MLC to Bel Haven under the designation "capital contribution," apparently with the explanation that this was an investment in another entity and not inteded to be an asset of MLC. When this is combined with the fact that the record shows that Bonaire was owned by ABC, and so was Maryelle, it is reasonably clear NEP made no $250,000 investment in cattle on the Monitor Ranch. Rather, funds came from ADC or ABL to NEP to MPR and back to ABL or ADC. When these facts are considered in conjunction with the fact that the $350,000 stated to be the capital investment of the "partners" in NEP also was primarily if not totally a transfer of funds to NEP from ABL, no substantive reason for the existence of NEP appears, and the conclusion to be drawn is that there was no substantive reason for the various transactions involving NEP. The record in this case shows that under date of December 20, 1974, there *124 are entries in NEP's books showing a transfer from ADC to NEP of $350,000 and a transfer from NEP to ABL in this same amount. The $350,000 transfer from ADC was composed of two items--one of $250,000 and one of $100,000. On that same day, NEP transferred, designated as "loans," $250,000 and $100,000 to ABL and on the same day received $350,000 from ABL designated as "repayment of loan." Again on that same day NEP transferred a $350,000 amount to ABL which it designated as "interest." These transactions are merely the circularization of money among various entities managed and controlled by Mr. Margolis. Mr. Margolis himself stated that he did not know whether the $350,000 the "partnership agreement" stated was to be contributed by the partners was actually paid in. Mr. Margolis' inaccurate recollection with respect to a vital step in a transfer of the MLC stock supports the lack of any substance to the various transactions involving NEP. Certainly if the transactions had substance, a proper transfer of the MLC stock to ABC would have been carried out in 1974 before NEP would have bought the Monitor Ranch assets. Mr. Margolis' inability to explain the necessity for the Kizt partnership *125 receiving an option to buy the Monitor Ranch from ABC, which option, according to the documents, was transferred to CRC and transferred from CRC to NEP, leads to the conclusion that the various documents were merely paper shams. Why NEP would need to obtain "financing" from WE to "purchase" the Monitor Ranch property when Kizt, according to Mr. Margolis' testimony, already had such a financing agreement with WE is never satisfactorily explained in the record. Mr. Margolis' explanation of the role of Kizt and CRC in the various transfers was as follows: Kizt was made up of four partnerships, and each of those partnerships had undertook programs in which they would essentially be non-risk. They were supplying financing. So their policy of operation was that they never themselves sold the property. * * * My recollection is that those four partnerships that made up Kizt, and Kizt itself, acquired rights to every different piece of property they can * * * where financing was needed and they re-sold. And they generally took five percent of the sale price payable over a period of years. Now how that was done * * *. There may be another document. But they sold to CRC. CRC's role *126 came about solely as a commission broker in the United States. The only reason it existed is because the companies that really made the money could not make the sales. CRC was under an agreement with a British Virgin Islands company. The British Virgin Islands company could take a commercial profit from the United States under the treaty, but could not maintain a permanent establishment. CRC, unrelated, had the permanent establishment, reported the transaction for United States tax purposes, kept a small commission for itself. The bulk went to EST, International in BVI. But they didn't keep it either. The bulk of the profit went to World Entertainers. That helped pick up their difference between the $350,000 and the $500,000 on the various transactions. * * * They made it on both sides generally. * * * We have examined this record with care to determine whether the various paper transactions involving NEP used to create tax deductions for clients of Mr. Margolis had substance or purpose aside from creating tax deductions. We find none. While there s testimony that Mr. Margolis talked to the original "partners" of NEP, it is not clear from the record whether all of *127 the eventual NEP "partners" were actually consulted about becoming "partners" or made any contribution to the partnership or knew of their so-called "loans" from ABL for the contribution. Based on this record, we conclude that for tax purposes the various paper transactions on which NEP based its claimed deductions for the years here in issue were shams. We have set forth in some detail the many various documents drafted and book entries made with respect to the Monitor Ranch complex and in our view the numerous transactions fail to show any substantive part NEP played in the financing of the Monitor Ranch complex. Petitioners' primary argument is that various documents and records put into evidence in this case show the various transactions to have been completed. It is petitioners' argument that these documents make a prima facie case for petitioners and the burden is on respondent to show that the transactions did not in fact occur. Petitioners recognize that the burden is on the taxpayer to present proof to substantiate a claimed deduction, but argue that once a taxpayer has presented books to evidence a transaction, it is incumbent upon the Commissioner to show that in *128 substance the transaction did not occur. Petitioners cite a number of cases in support of their argument, among them Stout v. Commissioner,273 F.2d 345 (4th Cir. 1959), revg. and remanding a Memorandum Opinion of this Court. The Stout case, as well as other cases relied on by petitioners, holds that where the Commissioner has determined that a taxpayer received unreported income, the presumption of correctness of his determination is overcome by evidence sufficient to show that such income was not in fact received and respondent must go forward with evidence to support his determination. In the Stout case the Circuit Court concluded that although book entries of transactions are not conclusive, they are entitled to great weight when made contemporaneously with the transaction and the conduct of the parties is consistent with the entries. However, the cases also hold that the disappearance of the presumption does not relieve a taxpayer of the burden of proving error in respondent's determination by a preponderance of the evidence. See Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. *129 See also United States v. Pomponio,635 F.2d 293, 297 n.4 (4th Cir. 1980). Petitioners, in their argument, confuse the burden on a taxpayer to establish a deduction with the burden to overcome the presumption of correctness attached to respondent's notice of deficiency. As the Circuit Court stated in Rockwell v. Commissioner,supra at 886: Whatever the proper rule may be where inclusion in income is controverted, there is no dispute that the taxpayer bears the burden of proof in substantiating claimed deductions. As we stated in Herbert,supra, 377 F.2d at 71: "It appears to us that the Tax Court has confused the burden of establishing receipt of income with the burden of supporting allowable deductions from income. In the former case the burden is on the Commissioner, and in the latter case the burden is upon the taxpayer." In Nor-Cal Adjusters v. Commissioner of Internal Revenue, 9 Cir., 1974, 503 F.2d 359, 361 (affirming the Tax Court's finding that corporate taxpayer's payments to officer-shareholders were dividends rather than deductible bonuses), we said: "When as here, a taxpayer claims a deduction which *130 is disallowed by the Internal Revenue Service, the burden is on the taxpayer to prove to the Tax Court the merit of the deduction. The shifting of that burden can only be caused by the interjection of "new matter" as provided by Rule 32 of the Rules of Practice of the United States Tax Court." See also, Karme v. Commissioner,673 F.2d 1062, 1065 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). In our view, however, petitioners' discussion of the weight to be given to the presumption of correctness of respondent's notice of deficiency is immaterial since there is ample affirmative evidence in this record to show a lack of substance to the transactions which petitioners state gave rise to the deductions claimed by NEP. There is evidence that not even in form was any ownership interest acquired in the Monitor Ranch by NEP. Certainly, had NEP actually paid $2 million for assets of the Monitor Ranch, it would have investigated whether the entity from which the assets were acquired held legal title thereto. The record also shows that with proper adjustments to be made for advances for financing of the ranch, the Utters, the Courtneys and Mr. Margolis *131 each had a one-third ownership interest in the ranch. Mr. Utter and Mr. Courtney had put up certain funds initially for their interest and Mr. Margolis was either to make loans or have a one-third interest. Mr. Margolis, through ABL and ADC, financed the purchase and operation of the Monitor Ranch complex. The funds came from ABL or ADC and were in form only passed through other entities. The various documents in connection with these pass-through of funds served no purpose except an attempt to obtain tax deductions for Mr. Margolis' clients by circular transfer of funds that were ultimately returned to the source from which they originated. It is well settled that for tax purposes the substance of a transaction controls over its form, Gregory v. Helvering,293 U.S. 465 (1935), and that where the sole purpose of a transaction is to obtain tax deductions, it will not be given effect for tax purposes. Knetsch v. United States,364 U.S. 361 (1960). The mere movement of funds from one related entity to another, back to the first entity, is not a substantive transaction for tax purposes. Karme v. Commissioner,73 T.C. 1163, 1186-1187 (1980), *132 affd. 673 F.2d 1062 (9th Cir. 1982); Perrett v. Commissioner,74 T.C. 111, 133 (1980), affd. 679 F.2d 900 (9th Cir. 1982). See Wham Construction Co., Inc. v. United States,600 F.2d 1052, 1054 n.2 (4th Cir. 1979), for citations of numerous cases that hold that "Usually tax liability is determined by an examination of the substance, and not the form of financial arrangements." Petitioners argue extensively on brief that consideration should not be given to the exhibits in this case dealing with the arbitration proceeding respecting the Monitor Ranch. Petitioners did not object to the evidence introduced with respect to this proceeding when it was referred to during the trial and witnesses asked about various documents presented in the arbitration proceeding. Petitioners actually used parts of the documents from the arbitration proceeding in the presentation of their case. In view of the extensive use made of the documents concerning the arbitration proceeding at the trial of this case without objection, petitioners' objections on brief to these documents are certainly belated. Petitioners contend that the documents relating *133 to the arbitration proceeding are not admissible in evidence under the provisions of Rules 403 and 408 of the Federal Rules of Evidence.[6]Rule 408 merely prohibits receipt of evidence of offers of compromise to "prove liability for or invalidity of the claim or its amount" and not for other purposes. Here, the documents were not offered for the purpose of proving liability for and invalidity of a claim. See County of Hennepin v. AFG Industries, Inc.,726 F.2d 149, 152-153 (8th Cir. 1984); see also, Orr Ditch & Water Co. v. Silver State Lodge,58 Nev. 292, 78 P.2d 95, 100 (1938). Also, this rule provides that it does not require "exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Petitioners have pointed to no evidence in this record which was presented in the course of the arbitration proceeding which was not otherwise discoverable. *134 If we assume that the arbitration proceeding would fall under Rule 408 as an offer in compromise, we consider it admissible for purposes of showing inconsistencies in the testimony of certain witnesses, the belief of the parties as to the ownership of certain properties which was not contested in that proceeding, and a source of evidence clearly otherwise discoverable. Likewise, there is no merit to petitioners' contentions that evidence produced in the arbitration proceeding should be excluded under Rule 403 as unfair and confusing or on the ground that it is immaterial. Rather than being confusing, this evidence helps to clarify certain transactions. Clearly it is material since it concerns the properties NEP claims to have purchased. Based on this record as a whole we conclude that the various transactions involving NEP lacked in substance and were mere shams created for no purpose other than obtaining tax deductions for clients of Mr. Margolis. Therefore we sustain respondent's disallowance of the deductions claimed by each petitioner from losses arising from a claimed partnership interest in NEP. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Esther LaFargue, docket Nos. 6084-78, 9263-79 and 13051-80; LaFargue Trust, Trustees: Maxine Gardner, Daniel Hawkes & Harry Margolis, docket Nos. 6085-78 and 9262-79; Emily A. LaFargue, docket Nos. 6160-78, 9260-79, 13052-80 and 17706-81; Robert L. Dunnett & Pamela J. Dunnett, docket No. 6897-78; Charles Johnson, docket No. 7329-78; Verne M. Walton & Particia A. Walton, docket Nos. 7330-78, 9014-79, 14473-80 and 19111-81; William Berman & Nana Berman, docket Nos. 7333-78, 9259-79, 11654-80 and 13284-81; Kenneth H. Reiserer and Deanna E. Reiserer, docket Nos. 7844-78 and 8185-79; Eugene H. Langsam & Myra C. Langsam, docket No. 2080-79; Walter Albert & Waltruat Albert, docket No. 2081-79; Walter M. Kearns & Abigail Kearns, docket No. 2293-79, 9444-79 and 14471-80; Misat Development Corp., docket Nos. 13128-79 and 16196-80; Jack Froom M.D. Medical Corp., a California Corp., docket Nos. 13129-79, 16193-80 and 23571-81; and Seymour Dematoff & Eleanor Dematoff, docket No. 35889-83.↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. Petitioners Eugene H. and Myra C. Langsam and Walter and Waltraut Albert were the stockholders of Premier Cup Co., Inc.↩
*. These parties entered into the agreement dated July 12, 1976, referred to in Note A.↩
4. Although the record is not clear, it appears that Mr. Margolis formed a corporation which he named "Merrimac" since the ranch was called "Monitor" with the idea of placing title to the ranch properties in the corporation, which would hold title for the equitable owners. Mr. Margolis testified in this respect: Q: Second to the last is Exhibit 583, and this is the settlement agreement in anticipation of the arbitration or as a result of the arbitration following. * * * The Witness: I remember the discussions--well, it does refresh my memory. In the civil war there was a great battle between the Monitor and the Merrimac. And when we decided to put these together, we decided to form a new corporation called the Merrimac because the other was the Monitor. And that's reflected in the--uh--uh-document. But I cannot tell you. Maybe Mr. Dunnett can [sic] that this was signed. I don't recall. Obviously there's a signature there. I don't know Mr. Collom's signature. This again--this was part of the plan; it was the substance. I know how the corporation got named, and I cannot tell you. You'll have to ask Mr. Dunnett.↩
5. Mr. Margolis testified in this respect: Q.I'd like to show you 588(vb) [the document entitled "Agreement Recognizing and Acknowledging the Sale and Transfer of Capital Stock" which Fairy Utter refused to sign] and ask you if that refreshes your recollection as to who owned it at this period of time and what they did with it. A. Well, it depends--this recites the entire history and is contemporaneous. My recollection is that Bob Dunnett did this agreement. I could be wrong. I may have done it. But it was in the Martin Trust and the next thing it was in the ABC Trust. Q. Could you describe why that was done? A. Well, hopefully they were back on track with the original planning, where the ranch sale was not copyable. It had grown. And I think it's accurate to say that by that time Utter was willing to have the ranch be owned by a foreign entity. So that capital gains ultimately could be sheltered. But additionally if you were in the foreign area, you could make certain types of loans in foreign areas to finance enterprises of this sort and avoid tax on the interest. I think by that time Utter had come to trust and was willing to do it. * * * A. This agreement was effectuated. We had the relationships with the parties. There were various discussions before this took place. As I indicated, and I want to emphasize for the record, even though we were in a bitter arbitration at one time, I have the highest regard for Chug Utter in terms of someone to buy animals from. So his sister-in-law, a capable and fine woman, came to me concerned about her brother-in-law. The whole family was there. And this agreement came out of that and was thereafter signed. And this was discussed that day. I don't remember if Bob Dunnett was present or not, but I remenber a lot of discussion about it at that time. And I recommended that we go forward with the ranch overseas. And I also recommended at that time that we get more financing. There was great discomfort on the part of my daughter and son-in-law. Because I told them there was no way in the world in which we could each retain a third. The rest didn't have enough money so what they were going to end up with, oh, in Chug's case I guess 15 percent or something like that. And my son-in-law, around 10 percent. And they were not happy about it. It was not a happy occasion. It was a happy one from my point of view because it really represented everybody getting together to make this ranch work. But this agreement came out of that discussion.↩
6. Rule 408 of the Federal Rules of Evidence provides: Rule 408. Compromise and Offers to Compromise Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.↩